436 F.2d 1153
 Charles Mason TIPPETT, Appellant,
v.
STATE OF MARYLAND, and Director of Patuxent Institution, Appellees.
Albert Delanor MUREL, Appellant,
v.
BALTIMORE CITY CRIMINAL COURT, and Director of Patuxent
Institution, State ofMaryland, Appellees.
Robert HAYES, Jr., Appellant,
v.
Harold M. BOSLOW, M.D., Director, Patuxent Institution, Appellee.
William R. MONROE, Appellant,
v.
DIRECTOR OF the PATUXENT INSTITUTION, and State of Maryland,
Appellees.
Bradley Arlington AVEY, Appellant,
v.
STATE OF MARYLAND, Harold M. Boslow, as Director of Patuxent
Institution, andVernon L. Pepersack, as
Commissioner, State Department of
Corrections, Appellees.
George L. CRESWELL, Appellant,
v.
DIRECTOR, PATUXENT INSTITUTION, Appellee.
 Nos. 13415, 13421, 13426, 13433, 13434 and 13441.
 United States Court of Appeals, Fourth Circuit.
 Argued May 8, 1970.
Decided Jan. 4, 1971.
 
 Karl Feissner and Andrew E. Greenwald, Hyattsville, Md. (Court-assigned) (William L. Kaplan, Thomas P. Smith, Fred R. Joseph, and Feissner, Kaplan & Smith, Hyattsville, Md., on brief), for appellants.
 Alfred J. O'Ferrall, III, Asst. Atty. Gen. of Md. (Francis B. Burch, Atty. Gen. of Md. and Edward F. Borgerding, Asst. Atty. Gen., on brief), for appellees.
 Curtis R. Reitz, Philadelphia, Pa. (Richard L. Bazelon, Philadelphia, Pa., on brief), for amicus curiae.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, and BUTZNER, Circuit judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 These consolidated appeals arise from a previous order of this Court[1] in which we directed the District Court to determine, after a full hearing, numerous questions involving the application of the Maryland Defective Delinquents Act.[2] Following an extensive series of hearings, and on consideration of the record of equally thorough proceedings in the state courts,[3] the District Court dismissed the petitions.
 
 
 2
 The petitioners contend that, as applied, the Act is constitutionally deficient in the following respects:
 
 
 3
 1. The definition of defective delinquency is too vague to be susceptible to any objective medical or legal application, and in fact defective delinquency is not determined on an objective basis; 2. The examination procedures offend due process in that (a) a person suspected of being a defective delinquent is not given prior notice of the request for examination, nor is he given an opportunity to contest the order referring him for examination; (b) he is required to submit to personal interviews with institutional psychiatrists, with a resulting risk of self-incrimination; and (c) he is not allowed to have an attorney present during the examination process; 3. The procedures for judicial determination of defective delinquency offend due process in that (a) hearsay evidence is admitted; (b) the state is not required to prove beyond a reasonable doubt, but only by a preponderance of the evidence, that the subject is a defective delinquent; (c) the indeterminate period of confinement, substituted for a previously imposed sentence of imprisonment for a term of years when a person is found to be a defective delinquent, violates the constitutional protection against double jeopardy; 4. The Act violates the prohibition against cruel and unusual punishment by including within its scope those persons whose conduct indicates a danger only to property rather than danger of violence to the person; and 5. Patuxent Institution lacks sufficient staff, facilities and finances to effectuate the purposes of the Act and, in consequence of these deficiencies, has failed to provide treatment as contemplated by the Act, thus depriving it of its character as a mental health institution and rendering it no more than a warehouse for obnoxious and antisocial elements of society.
 
 
 4
 The District Court considered each of these contentions in detail and found that the present application of the Act does not operate to deny any of the petitioners' constitutional rights. We affirm on the District Court's opinion. Sas v. State of Maryland, D.Md., 295 F.Supp. 389.
 
 
 5
 The Defective Delinquents Act is the outgrowth of Maryland's dissatisfaction with the result of more conventional methods of dealing with habitual criminal offenders. In 1948 and 1949 two special commissions, one consisting of lawyers, judges, physicians, psychiatrists and psychologists appointed by the Governor, and the other made up of psychiatrists and psychologists appointed by the Board of Corrections, made studies of the medical and legal aspects of recidivism in an effort to suggest a more effective method of coping with the problem. The result of the studies was a joint report recommending that a separate institution be established for 'criminal mental and emotional defectives' with a diagnostic clinic to determine what persons were susceptible to specialized treatment in the institution. In 1951 the recommendations were adopted by the legislature. Patuxent Institution was established to house and care for defective delinquents, defined by the statute as including any
 
 
 6
 'individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment.'[4]
 
 
 7
 The Act sets up a comprehensive scheme for referral, examination, commitment, treatment and release of persons suspected of being defective delinquents. A request for examination may be made only after the imposition of an active prison sentence upon a defendant's conviction of one of several enumerated classes of criminal offenses.[5] Examinations may be requested by the prosecutor, the Department of Correction, the trial judge on his own motion, or the defendant himself.[6] An order referring a defendant for examination is not reviewable. Once at Patuxent, the prisoner is examined by a physician, a psychiatrist and a psychologist, who are required to furnish a report to the committing court stating whether or not they believe him to be a defective delinquent. If the report is negative, he is returned to a penal institution to complete service of his sentence, with full credit for the time spent at Patuxent.[7] If the examiners believe him to be a defective delinquent, he is afforded a full and prompt judicial hearing, at which he is entitled to the assistance of retained or appointed counsel[8] and to receive a trial by jury.[9] He is allowed full access to all records, reports and papers in the possession of the institution or the court, including the report made by the independent, private psychiatrist who, on the prisoner's request, may be appointed to examine him at the expense of the state.[10] If he is found to be a defective delinquent he is committed to Patuxent for an indeterminate period, with the right of judicial review of his classification after the expiration of the greater of two years or two-thirds of his original sentence, and thereafter at three year intervals. Appellate review of any court order subsequent to the original referral for examination is provided.[11]
 
 
 8
 In addition to periodic judicial determinations, the Act requires review of each inmate's classification by the Institutional Board of Review not less than once each year.
 
 
 9
 The Board has the power to grant paroles or leaves of absence at any time, or to report to the committing court if it concludes that an inmate need no longer be classified as a defective delinquent.[12] If the court concludes that his condition is so improved that confinement at Patuxent is no longer required, it may order him returned to the Department of Correction to complete service of the original sentence with full credit for the time spent at Patuxent, order him released conditionally on parole or leave of absence, or order him released unconditionally, whether or not the original sentence would otherwise still be in effect.[13]
 
 
 10
 Critical to the appellants' argument is the premise that, without regard to the terminology used, Patuxent is in fact a penal institution, and the proceedings for determination of defective delinquency are equivalent in practice to criminal prosecutions. Almost without out exception, their various contentions rest on this foundation.[14] The District Court's rejection of this basic contention, which we affirm, of necessity defeats their arguments. As written by the legislature, construed by the courts, and applied by the staff, the Act selects a medically and legally recognizable class of persons for special treatment.[15] Although criminal conduct is necessarily bound up in every case, the inquiry does not focus on particular criminal acts but on the mental and emotional condition of the person thought to be a member of the statutorily defined class. It is that, and no other factor, which ultimately determines his classification and treatment. In this context, the denomination of the proceedings as civil rather than criminal is not a semantic exercise but a factual description of what occurs. The procedural safeguards erected by the statute are adequate to meet present needs and to protect the petitioners' constitutional rights.
 
 
 11
 In sum, the Act represents an enlightened and progressive experiment aimed at rehabilitating persons whose anti-social activities are occasioned, at least in part, by mental disorders. The present administration of the Act demonstrates a sincere and vigorous attempt to effectuate its policies. By the petitioners' own account, the state has expended to date $28,000,000 for plant and facilities at Patuxent. Legislative appropriations for its operation have continuously increased, not only in absolute terms but also for each inmate and as compared with the appropriations for operating regular penal institutions. Currently the appropriations per inmate are three times the amount allocated to the Reformatory, four times that provided for the House of Correction, and five times the amount allotted for the Penitentiary. Improvements in and expansion of staff, therapeutic facilities, vocational and educational training, and out-patient services continue.[16] There is reason to believe that the effort may prove successful. Based on the figures available from its brief operation, the recidivism rate from Patuxent, which deals with a population composed entirely of confirmed recidivists, is lower than the combined rate for all of the penal institutions in the United States.
 
 
 12
 We recognize that many problems remain and that there are many areas of possible improvement. For example, it might prove fruitful to permit the independent psychiatrist to participate in the proceedings at an earlier stage than is presently allowed; his participation in staff conferences may be beneficial to the staff and to the inmate he examines. But, in this comparatively new field of medical rehabilitation, experience is more likely than fiat to suggest constructive avenues for change.
 
 
 13
 Mr. Chief Justice Burger has taken the lead in pleading for a reformation of our correctional system, which, in general, is woefully deficient in its rehabilitative function. Too many prisoners serve their allotted time and are released into society with the same predisposition to anti-social conduct as they had before their arrests. In all too many instances, imprisonment serves the converse of the rehabilitative purpose, converting good prospects for rehabilitation into hardened criminals. The result, of course, is a grave wrong for those convicts who could be helped by getting help. It is a grave wrong to society, which must suffer their continued depredations when released from prison until they are confined again.[17]
 
 
 14
 The interests of society and of the prison population demand the sort of innovative reappraisal of our correctional institutions, their practices and procedures, for which the Chief Justice has pled. At the very least, Patuxent is an encouraging example of one kind of approach to a solution of these difficult problems. Time is required to appraise its ultimate effectiveness, but there is firm foundation for hope that it will prove a material and positive step toward the rehabilitation of mental and emotional defectives, and the protection of society from those anti-social defectives who are beyond rehabilitation.
 
 
 15
 The approach of Maryland's Defective Delinquent Act is essentially a medical approach, but the clear promise it has demonstrated would be withdrawn should it be held, as the petitioners contend, that the diagnostic and treatment processes must be converted into an adversary legal process in which the patient is entitled to all the constitutional protections available to a defendant in a criminal proceeding. It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that. The injection of broad legal restraints into the diagnostic and treatment procedures that would deny Patuxent's substantial prospect for improvement over our earlier practices might well restrain most other experimentation looking toward conversion of our correctional institutions into effective rehabilitating agencies.[18]
 
 
 16
 The suggestion in the dissenting opinion that counsel be brought into the proceedings to a limited extent at an earlier time, like our similar suggestion with respect to the private psychiatrist, may have merit as one for future trial and experimentation. Its concededly tentative nature, in light of the uncertainties permeating this field of knowledge, however, hardly leads to the conclusion that it presently is an absolute requirement of the due process clause. The question before us is whether the procedures embodied in the statute meet the minimal requirements of the Constitution. In the appraisal of that question, settled notions of the essential elements of fairness play a great part, but the fact that we can conceive of tentative avenues for future trial experimentation to determine their impact upon the fairness of the procedures does not support a conclusion that our hesitant suggestions are already clad in the full regalia of due process.
 
 
 17
 The burden of persuasion is in the same category. We might all be happier had it been stated in terms of clear and convincing proof rather than in terms of a preponderance of the evidence. However meaningful the distinction may be to us as judges, however, it is greatly to be doubted that a jury's verdict would ever be influenced by the choice of one standard or the other. We all know that juries apply the preponderance standard quite flexibly, depending upon the nature of the case. In any event, in the present state of our knowledge, choice of the standard of proof should be left to the state. A legislative choice of the preponderance standard, the same standard governing civil commitments of mentally ill persons who have no history of criminality, ought not to be held in violation of due process requirements when we have no firm foundation for an evaluation of the practical effects of the choice.
 
 
 18
 Since the Act's provision for judicial review of a defective delinquent's initial commitment to Patuxent and his continued confinement there are adequate, we conclude that the Constitution does not require that the procedures under the Act be treated as if they were criminal proceedings subject to the self-defeating strictures which the Constitution appropriately throws around the shoulders of defendants facing criminal charges in adversary legal proceedings.
 
 
 19
 Affirmed.
 
 
 20
 SOBELOFF, Circuit Judge (concurring in part and dissenting in part):
 
 
 21
 I am enabled to concur in part with my brethren largely because of their explicit statement in footnote 18 that:
 
 
 22
 We do not suggest that our disposition of these cases should be taken as a final and unalterable evaluation of all Constitutional questions which may arise out of the Act's administration. We would not consider ourselves bound by today's decision in a future case if later experience should show serious unfairness in the administration of the Act.
 
 
 23
 This is a wise and necessary reservation and deserves emphasis, for as Judge Bell observed in Sas v. State of Maryland, 334 F.2d 506, 516 (4th Cir. 1964), the Act is 'fraught with the possibility of abuse * * * if not administered in the spirit in which it is conceived * * *.'
 
 
 24
 One of the issues we should consider open for future evaluation is the adequacy of treatment at Patuxent. Our approval of the Maryland Defective Delinquent Act is grounded partly on the assumption that the state will continue to furnish Patuxent with sufficient funds, personnel and facilities to justify realistic hopes of rehabilitating its inmates. Any future review must appraise not only the general treatment program, but whether the particular prisoner before the court is receiving the benefits of Patuxent's program. It does him no good if there is a program of treatment, but it has been arbitrarily withheld from him.[1]
 
 
 25
 Notwithstanding the District Court's finding that treatment at Patuxent is presently adequate, this remains an undeniably difficult case. The majority dismisses petitioners' serious constitutional challenges by the simple expedient of labeling the defective delinquency proceedings 'civil.' But the attempt to sidestep constitutional issues by asserting that the process is 'noncriminal' was disapproved by this court in Sas, supra, as a 'futile exercise in semantics' and has been expressly rejected by the Supreme Court as insufficient justification for disregarding the strict safeguards accorded in criminal cases.[2] As that Court recently noted in the context of the juvenile process: 'Civil labels and good intentions do not themselves obviate the need for criminal due process safeguards * * *.' In re Winship, 397 U.S. 358, 365-366, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).
 
 
 26
 The guarantees constitutionally required in criminal prosecutions are dictated by the severity of the sanctions imposed, which may deprive an individual of his liberty. The consequences of commitment under the Patuxent scheme are hardly less onerous. Patuxent inmates are involuntarily confined under maximum security conditions. Some may remain at Patuxent in a prison-like environment for life because they are deemed too dangerous either to life or to property to be released. As the District of Columbia Circuit has aptly noted:
 
 
 27
 When a determination of 'dangerousness' will result in a deprivation of liberty, no court can afford to ignore the very real constitutional problems surrounding incarceration predicated only upon a supposed propensity to commit criminal acts. Incarceration may not seem 'punishment' to the jailors, but it is punishment to the jailed. Cross v. Harris, 135 U.S.App.D.C. 259, 418 F.2d 1095, 1101-1102 (1969).
 
 
 28
 Although prisoners are entitled to due process protections regardless of the nature of the proceeding, and the Defective Delinquent Act is in many ways indistinguishable from a criminal statute, an unmodified application of the full procedural safeguards afforded in criminal cases may render the Act unworkable. The Maryland act represents an innovative approach appropriate to deal with an identifiable segment of the criminal population, and until the results can be adequately appraised, some flexibility in the procedures employed by the state is justified. While experiments in penology do not warrant suspending constitutional rights, the unique context in which the Act operates may justify some variation in the manner of their application. However, because the Maryland act bears such close resemblance to the criminal process, the state must make the least drastic departure from the safeguards applicable to criminal proceedings as will avoid destruction of the statutory scheme. The means employed to resolve the dilemma must not sacrifice the essentials of the constitutional safeguards, and the burden of justifying any challenged procedure or practice rests upon the state.[3]
 
 I. RIGHT AGAINST SELF-INCRIMINATION
 
 29
 Upon referral to Patuxent, a prisoner is required to submit to a battery of tests and interrogations by the social service staff, a psychiatrist and a psychologist. The statute directs the staff to make inquiry into the crime for which the prisoner has been sentenced and the circumstances surrounding the crime. The interviews also focus on any other crimes and antisocial behavior in his past. There is no contention by the state that the disclosures are voluntary.
 
 
 30
 The history of petitioner Bradley Avey aptly illustrates the consequences of refusal to submit to the examinations. Avey was committed in December 1965 for an evaluation by the staff. For four years he continuously refused to submit to personal interviews on the ground that his right against self-incrimination would be violated. Consequently he never received a hearing on his defective delinquency status and remained in the receiving ward of the Institution.[4] The case presented by petitioner Avey is not an unusual one. The Institution admits that it has a substantial number of inmates who refuse to submit to the interrogation by the medical and social services staff, and whose judicial hearings are delayed until their cooperation can be achieved. The Director of Patuxent states that an inmate's persistent refusal to be examined could indefinitely postpone any judicial hearing, and result in confinement for the rest of his life. The Maryland Court of Appeals has upheld the legality of this practice. State v. Musgrove, 241 Md. 521, 217 A.2d 247, 252 (1966).[5]
 
 
 31
 The reluctance of Patuxent inmates to respond to the staff's probing is understandable. Admissions made concerning mental state and past criminal behavior provide significant evidence for the state to use at the judicial hearing on defective delinquency.[6] The petitioners maintain that they have an absolute right to silence, and cannot be forced to reveal information which may be used against them. But determining defective delinquency involves essentially an inquiry into the state of the inmate's mind. Denied direct access, the state psychiatrists would be relegated to secondhand information in arriving at a diagnosis. In United States v. Albright, 388 F.2d 719 (4th Cir. 1968), this court emphasized the necessity for a government psychiatric examination where the mental condition of a criminal defendant was in issue. It was reasoned that the defendant had waived his right to silence by raising the insanity issue as a defense, but the underlying thrust of the Albright opinion was the recognition that a reliable inquiry into the defendant's mental state is possible only with his active cooperation.
 
 
 32
 With the continuing reservation that this issue is open to further consideration, I agree, for the present, that the right against self-incrimination cannot be rigidly applied in Patuxent proceeding. I rest, however, not on the asserted ground that the Act is 'civil' but that, because of the unusual nature of the necessary inquiries, the legitimate objectives of the legislation would be frustrated were inmates permitted to refuse cooperation. Granting the inmate the right to silence would in many instances thwart the personal examinations and interviews considered indispensable in determining whether the prisoner is or is not a defective delinquent.[7]
 
 II. THE RIGHT OF CONFRONTATION
 
 33
 The records compiled by the Patuxent staff, upon which they rest their conclusions, contain extensive reports from various sources as to the inmate's past criminal and antisocial behavior. These reports are admissible at the judicial hearing, though based on observations and conclusions of persons who do not testify in court. The introduction of this hearsay evidence in a criminal prosecution would unquestionably violate a defendant's right to confront and cross-examine witnesses against him as guaranteed by the Sixth Amendment.[8]
 
 
 34
 The hazard of hearsay reports is that they may become vehicles whereby false allegations enter the judicial proceedings-- allegations which the prisoner may be hard pressed to refute. Although any witness subject to the jurisdiction of the court may be subpoenaed, the prisoner's counsel may often be unable to find and produce witnesses to contest reported incidents thus introduced at the judicial hearing.
 
 
 35
 Yet it must be recognized that a meaningful evaluation of the inmate's mental condition will often depend on an assessment of numerous incidents, some long in the past. If the jury is to be apprised of the considerations underlying the psychiatrists' conclusions without imposing a truly impossible burden on the state authorities, flexibility in departing from strict rules of evidence may be unavoidable. At issue is the subject's entire lifetime behavioral pattern, not whether a certain act was committed. In light of the special and unusual nature of the inquiry, hearsay evidence may be necessary for the staff to rely upon in forming its opinion; and if in the subsequent judicial review the jury is not to abdicate its obligation to make an independent judgment, it must, in its turn, have access to all of the information, including the hearsay evidence, underlying the expert opinion of the psychiatrists. Thus the experts are afforded the latitude essential to perform their function and the jury is not restricted in its purview of the case. Nevertheless, no evidence denying a prisoner the right of confrontation should be admitted unless indispensable to explain to the jury the foundations of the psychiatric opinions; admission of such evidence is hardly justified where the psychiatrists have relied primarily on personal interviews and available witnesses in forming their conclusions.
 
 
 36
 Of course, beyond the confrontation issue, due process commands that a reliable evidentiary foundation be laid in defective delinquency proceedings, as in any other proceeding, civil or criminal. Accordingly, any assessment of the sufficiency of the evidence to support a defective delinquency finding involves scrutiny of the character as well as the substance of the admitted evidence. If at the judicial hearing there appears serious doubt as to the reliability or trustworthiness of the reports of antisocial or criminal behavior, the trial judge should in the exercise of his discretion exclude the hearsay. Likewise, as to hearsay evidence which is admitted, the jury should be duly cautioned on the risks inherent in any hearsay testimony.
 
 III. RIGHT TO COUNSEL
 
 37
 Although counsel is provided at the judicial hearing itself, he is presently entirely excluded from the interrogations and investigations conducted by the staff for the purpose of determining defective delinquency. One perceives a strong analogy, however, between the initial steps at Patuxent and the pretrial stages of criminal prosecutions in which the Supreme Court has insisted on the right to counsel: Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (police interrogations); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (lineups); and Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (preliminary hearings before magistrates). Both the Patuxent prehearing stages and preliminary criminal phases are critical links in chains potentially leading to long confinement, and the same due process considerations dictate counsel's presence under both schemes. The assistance of counsel during the fact-gathering and adjudicating process at Patuxent might protect the inmate against misguided or erroneous conclusions by the staff[9] and could facilitate timely discovery of the nature of the state's case, making possible the preparation of a proper defense at the judicial hearing.
 
 
 38
 As discussed in the preceding section, the record compiled by the staff embodies an accumulation of information some of which may be of doubtful reliability. The inmate's background is by the staff's own admission one of the most important factors, if not the single most important factor, in diagnosing the inmate. If the history is inaccurate, the medical evaluation is liable to be incorrect. There must be an early opportunity for counsel to question the contents of the inmate's dossier to avert the danger of a vital staff recommendation being founded on false data.
 
 
 39
 The majority makes this interesting suggestion:
 
 
 40
 '* * * it might prove fruitful to permit the independent psychiatrist to participate in the proceedings at an earlier stage than is presently allowed; his participation in staff conferences may be beneficial to the staff and to the inmate he examines.'
 
 
 41
 I agree, but do not see why a measure of participation by counsel should not be tolerated. As Judge Bell of this court has declared:
 
 
 42
 '* * * there is no reason to assume that reputable counsel and psychiatrists could not cooperate in the administration of tests and the necessary factual investigations of the patient's background to verify or refute his own statements.'
 
 
 43
 Timmons v. Peyton, 360 F.2d 327, 331 (4th Cir. 1966).
 
 
 44
 Indeed, there is reason to think that much of the present resistance of prisoners to submitting to the Patuxent interrogations arises from suspicion and misunderstanding on their part which a lawyer could in many cases dispel, thus facilitating the staff's work. Staffmen, at the beginning at least, are likely to be suspect simply because they are members of the institutional apparatus.
 
 
 45
 The retained or appointed counsel should consult with the prisoner as soon as practicable after his admission to the Institution. I would not insist that counsel be present during the individual psychiatric examinations, but counsel should be allowed access to the information concerning the prisoner's history as it is assembled. When the inmate is admitted into the final conference for questioning by the staff, counsel should be allowed to attend, to interrogate his client in order to clarify matters in dispute, and to make a statement on his client's behalf. Although the staff may of course consult with one another in private, a free and open discussion by counsel with the psychiatric staff as to the basis of their report should be encouraged. It would enhance the fairness of the process and enable counsel to obtain a minimal familiarity with the complex psychiatric issues a defective delinquency determination is likely to involve. It is not my purpose to convert the staff conference into a full-fledged adversarial proceeding, but only to guard as far as possible against the informal fact-gathering's resulting in an inaccurate factual basis for the psychiatrists' conclusions.
 
 
 46
 There is no justification for the unlimited confidence accorded to the staff members and the apprehensions the majority expresses over the allowance of any role to lawyers. I rather think that the staff is inclined to overestimate the need and the usefulness of secrecy, and that if a more flexible policy were adopted it would be found not unworkable, but beneficial. It would help to clear away suspicion that fundamental fairness is being destroyed under a cloak of concealment.
 
 
 47
 The above suggestions with respect to the right of counsel are advanced tentatively. If adopted, they should be deemed, like other conclusions of mine and the majority's own holdings, subject to review and reconsideration from time to time as experience dictates.
 
 IV. THE STANDARD OF PROOF
 
 48
 The Defective Delinquent Act does not itself specify the burden of proof that the state must sustain in order to commit an individual to Patuxent for an indefinite period. The Maryland courts have sanctioned the civil standard of 'fair preponderance.' See Purks v. State, 226 Md. 43, 171 A.2d 726 (1961).
 
 
 49
 The petitioners assert on the contrary that due process requires the state to prove 'beyond a reasonable doubt' that the inmate is a defective delinquent. They rely on the recent Supreme Court case of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which invalidated a New York statutory provision allowing juvenile delinquency determinations to be made upon a preponderance of the evidence. The Court held that proof beyond a reasonable doubt is constitutionally required in adjudications of juvenile delinquency as in criminal trials. It expressly rejected the New York Court of Appeals' view that there was only a 'tenuous' difference between the reasonable doubt and the preponderance standards. The Supreme Court would not acquiesce in this minimization of the difference. Instead it stressed the danger that the lesser standard might be misinterpreted as calling on the trier of fact 'merely to perform an abstract weighing of the evidence in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition asserted.' 397 U.S. at 367, 90 S.Ct. at 1074. The reasonable doubt standard is indispensable in both criminal and juvenile proceedings, according to the Supreme Court, for 'it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' 397 U.S. at 364, 90 S.Ct. at 1072.
 
 
 50
 The objections to the preponderance standard apply with equal force in defective delinquency hearings-- indeed they are even more compelling in the latter class of cases, since indefinite incarceration is at stake. Due process commands that the jury must be satisfied beyond a reasonable doubt as to all objective facts in dispute, including the truth of any alleged incidents relied upon by the psychiatrists in reaching their recommendation.
 
 
 51
 It must be recognized, however, that as to the ultimate issue of the inmate's dangerousness, the beyond a reasonable doubt standard may in practical operation be too onerous. After all, the ultimate issue is not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emotional character. Such a subjective judgment cannot ordinarily attain the same 'state of certitude' demanded in criminal cases. A number of commentators have suggested that a standard lying between the civil and the criminal may suffice where a determination of 'dangerousness' is at issue. Frequently advocated is a standard of 'clear and convincing evidence.'[10]
 
 
 52
 This measure of proof is not entirely lacking in judicial support. In Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), the Supreme Court was faced with a dilemma similar to the one we now confront. The issue was what standard of proof is required in deportation proceedings. The Court held that deportation could not be considered tantamount to a criminal conviction, and did not call for the same standard of proof. Yet, perceiving that deportation was a drastic deprivation, the Court held it impermissible for an individual to be 'banished from this country upon no higher degree of proof than applies in a negligence case.' 385 U.S. at 285, 87 S.Ct. at 487. The Court fashioned an intermediate standard of 'clear, unequivocal, and convincing evidence.'[11]
 
 
 53
 The Court's approach in Woodby seems to be suitable for defective delinquency hearings. We should not tolerate the lax standard presently employed in committing inmates to potentially lifetime incarceration at Patuxent. Due process, I would hold, requires that the state shall establish by at least 'clear and convincing evidence' that the individual is a defective delinquent. As Justice Harlan commented in his concurrence in Winship, supra, 'a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' 397 U.S. at 370, 90 S.Ct. at 1076. The standard of proof is more than an empty semantic exercise; it reflects the value society places on individual liberty. I cannot agree that the Constitution tolerates an indeterminate confinement at Patuxent on no higher level of proof than that applied in a civil proceeding for money damages.
 
 V. CONCLUSION
 
 54
 In light of the views set forth in Parts III and IV, I would reverse the decision of the District Court and require the state to hold new defective delinquency hearings for the petitioners under a proper standard of proof. In any factfinding and adjudicative process hereinafter conducted by the Patuxent staff, counsel should be allowed to participate in the manner described in Part III.
 
 
 55
 As already indicated, I think that the courts should regard Patuxent with a benign eye and that for the present a degree of flexibility is appropriate in dealing with Patuxent issues. I venture now to add a word of admonition to the officials of the Institution. In formulating and executing institutional policies the administrators should defer to traditional standards of fair procedure prized, even though not specifically commanded, by the courts. The officials' aim should not be minimal compliance to escape judicial condemnation, but maximum compliance with the spirit and essence of the Bill of Rights protections. Present policies and practices should be thoroughly examined by them in light of these principles. Administered with this unstinting attitude, the Institution's still experimental program will the more likely progress smoothly and meet with general satisfaction.
 
 
 
 [1]
 Sas v. State of Maryland, 4 Cir., 334 F.2d 506. The original petitioner is no longer a party to these proceedings. He was found to have responded favorably to treatment and was released from confinement. He did not join in this appeal
 
 
 [2]
 Annotated Code of Maryland, Article 31B
 
 
 [3]
 See Director of Patuxent Institution v. Daniels, 243 Md. 16, 221 A.2d 397
 
 
 [4]
 Annotated Code of Maryland, Article 31B 5
 
 
 [5]
 Id., 6(a)
 
 
 [6]
 Id., 6(b)
 
 
 [7]
 Id., 7(a)
 
 
 [8]
 Id., 8(a), (b)
 
 
 [9]
 Id., 8(c)
 
 
 [10]
 Id., 7(b), 8(b)
 
 
 [11]
 Id., 11, 11A. Although the time limitation on initial judicial reappraisal of an inmate's status is of considerable length in the case of a long original sentence, the writ of habeas corpus is available without time limitations, and it is expressly preserved to inmates of Patuxent by 10(c) of the Act. In addition, the Board of Review may seek judicial reappraisal of an inmate's status at any time, pursuant to 13(f)
 
 
 [12]
 Id., 13(b), (d). Leaves of absence can be tailored by the Board of Review to meet individual needs. The leaves may range in length from a few days holiday leave, through longer periods designed to provide a basis for determining whether the inmate's social interactions have significantly improved, to a full year's leave to permit an inmate to live and work as a normal member of society, but subject to observation and supervision. In addition, a 'live-in work-out' program has been devised to aid some inmates in coping with the transition between inmate status and full release. A 'half-way house' has also been established to assist in the transition
 
 
 [13]
 Id., 13(f)
 
 
 [14]
 One contention which does not rest on this foundation is the claimed impropriety of including within the statutory class those persons who have demonstrated only a propensity for committing crimes carrying no danger of violence to the person. That question is not properly before us. Although the statute as construed permits this classification, the District Court found as a fact that it is not so applied at the present time. None of these petitioners, nor any other person now confined at Patuxent, was classified as a defective delinquent solely on the basis of a propensity to commit only 'property crimes.' The staff, as a matter of policy, does not recommend for classification as defective delinquents any such person. To the extent that a propensity to commit 'property' crimes as well as a predisposition to violence or threats of violence may have been a factor in the classification of some of the petitioners, we can perceive no reason why the treatment provided at Patuxent should not be as beneficial in combatting that propensity as it is in dealing with more violent manifestations of mental disorder, nor why the state's interest in treating it is any the less legitimate. The question raised by the petitioners need not be resolved unless and until the evaluation policies in effect at Patuxent are changed to make operative the classification of which they complain
 
 
 [15]
 In Schreiber, Indeterminate Therapeutic Incarceration of Dangerous Criminals: Perspectives and Problems, 56 Va.L.R. 602, it is suggested that the statutory definition of 'defective delinquent' should be made more specific. Although we recognize the risk of vagueness inherent in the terminology employed, an attempt to make precise legal definitions of medical concepts embodies a risk of over-definition. We do not think that the definition now used is so vague as to offend due process
 
 
 [16]
 Presently the staff at Patuxent includes ten psychiatrists, ten psychologists and fourteen social workers for approximately 350 inmates. The total psychiatric staff of all other correctional institutions in the entire United States is about fifty. See Schreiber, supra, note 35 at 607
 
 
 [17]
 See United States v. Chandler, 4 Cir., 393 F.2d 920, 927-929
 
 
 [18]
 We do not suggest that our disposition of these cases should be taken as a final and unalterable evaluation of all Constitutional questions which may arise out of the Act's administration. We would not consider ourselves bound by today's decision in a future case if later experience should show serious unfairness in the administration of the Act
 
 
 [1]
 See Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1966), and Millard v. Cameron, 125 U.S.App.D.C. 383, 373 F.2d 468 (1966), where Judge Bazelon discussed the constitutional underpinnings of a 'right to treatment' when an individual is involuntarily confined on 'humane therapeutic' grounds. See also Comment, Civil Restraint, Mental Illness, and the Right to Treatment, 77 Yale L.J. 87 (1967)
 
 
 [2]
 See In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), the Court emphasized the irrelevancy of arbitrary labels in dealing with procedures under Colorado's Sex Offender Act. 'These commitment proceedings whether denominated civil or criminal are subject both to the Equal Protection Clause * * * and to the Due Process Clause.' 386 U.S. at 608, 87 S.Ct. at 1211. The same thought has been stressed in Heryford v. Parker, 396 F.2d 393, 396 (10th Cir. 1968) (the state has an 'inescapable duty to vouchsafe due process' in commitment proceedings for the mentally deficient); and in United States ex rel. Gerchman v. Maroney, 355 F.2d 302, 312 (3rd Cir. 1966) ('due process cannot be satisfied by partial or niggardly procedural protections' in proceedings under Pennsylvania's Sex Offender Act)
 
 
 [3]
 In essence, the court is required to examine the Act to determine whether 'less drastic means' might be employed to effect the objectives of the state. In the First Amendment area, which in our constitutional system is no less fundamental than individual liberty, the Supreme Court has allowed application of a least drastic means test where a compelling state interest is shown. See United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). A no more rigorous doctrine is called for in analyzing the adequacy of the procedural safeguards in commitments under this statutory scheme
 
 
 [4]
 According to the appellee's brief, p. 23, after the decision of the District Court in this case, Avey was recommended by the Patuxent staff for commitment to Patuxent as a defective delinquent. The record does not disclose whether he finally submitted to interrogation after the adverse decision below or whether the staff proceeded to recommend commitment without his cooperation. In at least one earlier case, the Patuxent staff did recommend an inmate's commitment, despite his consistent refusal to be interviewed. See Joint Record Extract, p. 602, Director of Patuxent Institution v. Daniels, 243 Md. 16, 221 A.2d 397 (1966)
 Avey's incarceration at Patuxent has not run beyond the original sentence imposed for his underlying criminal conviction. We are thus not faced with a situation where confinement rests solely on a refusal to cooperate. The state would undoubtedly have to bear a heavy burden in justifying extended commitment where there has been no judicial hearing.
 
 
 [5]
 The problem of the uncooperative defendant is frequently confronted in psychiatric examinations for competency and criminal responsibility. Sanctions less severe than those imposed at Patuxent have been suggested to induce cooperation. See Judicial Conference of the District of Columbia, Report of the Committee on Problems Connected with Mental Examination of the Accused in Criminal Cases, Before Trial 107-18 (1966); Note, Pre-Trial Mental Examination and Commitment: Some Procedural Problems in the District of Columbia, 51 Geo.L.J. 143, 152-56 (1962). I reserve opinion as to the constitutionality of confinement at Patuxent without a hearing where the inmate's original criminal sentence has expired
 
 
 [6]
 It needs to be emphasized that the prisoner is asked to speak of his past in order to gain an insight into his personality, his mind and his emotions, not to entangle him in any criminal prosecution. The District Court expressed a proper concern that disclosures of criminal acts by the inmate might lead to new charges. The court suggested that in such a case the exclusion at any subsequent criminal trial of the inmate's admissions would suffice to protect his constitutional rights. I agree with the court's concern, but would go further. Not only should such disclosures be inadmissible in any criminal proceeding, but they ought not become the predicate for further investigation leading to a prosecution. I would insist that the prisoner is entitled to complete immunity in respect to matters he is compelled to disclose
 There is an additional complication where the prisoner has pending an appeal from his conviction. In no event should any information divulged or evidence developed from information divulged be admissible against the prisoner if a new trial is awarded.
 These matters need not be further pursued since they are not now before us.
 
 
 [7]
 Petitioners' reliance on the Supreme Court's decision in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) is misplaced for at least two important reasons. The aim of the inquiry in the Gault hearings was not to ascertain the mental state of the juvenile, but whether he had committed the specific offense with which he stood charged. Here the inquiry is not intended primarily to prove past criminal conduct, but to assess the inmate's emotional and mental state. Moreover, in Gault the Court discounted the state's claim that the juvenile process 'rehabilitated' its clients. By contrast, Patuxent, according to the District Court's finding, does engage in a bona fide treatment program
 
 
 [8]
 In Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) and Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), the Supreme Court recognized this right of a defendant under the Sixth Amendment as fundamental and essential to a fair trial and therefore obligatory on the states under the Fourteenth Amendment
 
 
 [9]
 In Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695 (1969), the court discussed the implication of United States v. Wade, supra, in respect to counsel's participation in staff conferences at Saint Elizabeths Hospital where a recommendation is reached as to a defendant's competency and criminal responsibility. The court held that counsel should be included in the process, though the incomplete factual record in that case prevented the court from formulating precise rules. The court emphasized:
 There can be little doubt that his staff conference at Saint Elizabeths will represent an important confrontation (of the defendant) with experts likely to testify for the Government. Moreover, just as the Supreme Court argued in Wade that a witness once having identified a suspect in a lineup is unlikely to retract the identification at trial, our experience suggests that the representatives of Saint Elizabeths rarely contradict in their testimony at trial an opinion they have voiced at the staff conference.
 407 F.2d at 699.
 
 
 [10]
 Note, Civil Commitment of the Mentally Ill: Theories and Procedures, 79 Harv.L.R. 1288, 1291 (1966); Comment, Due Process for All-- Constitutional Standards for Involuntary Civil Commitment and Release, 34 U.Chi.L.R. 633, 654-59 (1967)
 
 
 [11]
 The Court noted that that standard was no stranger to the law, and has been traditionally imposed in civil cases involving allegations of civil fraud, adultery, illegitimacy of a child born in wedlock, lost wills, oral contracts to make bequests, and the like. 385 U.S. at 285 fn. 18, 87 S.Ct. 483. See 9 Wigmore, Evidence 2498 (3d ed. 1940)