**In re RENOVIZORS, INC., Debtor.**

**Bankruptcy No. 94–54124.**

United States Bankruptcy Court, N.D. California.

Sept. 30, 1997.

**234**

Julian O. Standen, Deputy Attorney General, San Francisco, CA, for Claimant, California State Board of Equalization.

David M. Kirsch, Law Offices of David M. Kirsch, San Jose, CA, for Debtor, Renovizors, Inc.

## OPINION

MARILYN MORGAN, Bankruptcy Judge.

The court is asked to determine the validity of the State Board of Equalization's (SBE) claim against the debtor, Renovizors, Inc. (Renovizors). The SBE filed a proof of claim for $442,194.18, which includes $230,846.11 in underreported sales taxes, $57,711.71 in fraud penalties, and $130,551.75 in interest. Renovizors objects to the claim, contending that the SBE's audit methodology is incorrect and that the fraud penalty has been unfairly assessed.

### I. FACTUAL BACKGROUND

Renovizors was an interior design company that sold decorating products and provided residential remodeling services. The company incorporated in December 1984, commenced business in the second quarter of 1985, and ceased operations in 1994. Cherie and William Rose were Renovizors' sole shareholders. Cherie Rose handled interior design and decorating for Renovizors, while William Rose managed the construction and remodeling aspects of the business. William Rose also has a law degree.

From 1985 to 1990, Renovizors was located at 1133 Lincoln Avenue in San Jose. The store had 1,500 square feet of showroom space. Renovizors' sales force managed daily store operations, while the Roses met with customers in their homes or on job sites. Jan Huotari, Renovizors' bookkeeper, handled all of the bookkeeping. Except for one sales tax return for the second quarter of 1985, Huotari prepared and signed all returns.

Renovizors used an informal method of tracking sales revenue that did not maintain invoices numerically. Each sales invoice was in triplicate form. The customer kept the first copy, the second copy went into the customer's file, and the third copy went into a drawer in the showroom. Huotari added the invoices at the end of each day in order to reconcile the bank deposit and produce what the Roses termed a "daily." The daily listed the value of each item sold, but did not specify the types of items sold. Huotari used the daily to prepare the deposit slip for the bank, and, according to William Rose's testimony, entered information from the daily into a computer program. Renovizors had automated its system for issuing checks and for producing its cash disbursements journal.

In late 1990, the Roses expanded the interior decorating business. They leased a much larger store with 7,500 square feet of showroom space at 1047 Lincoln Avenue, a short distance from the original store. The new showroom ultimately contained thirty-two "vignettes" or showroom areas designed to look like living rooms, dining rooms or bedrooms, costing between $7,800 and $12,000 each. Cherie Rose testified that a typical vignette might contain a sofa that cost Renovizors approximately $1,500, two or three chairs at $1,200 to $1,500 each, a table

at $1,000, end tables at $500 to $700 each, lamps at $200 to $500 each, a rug at around $1,200 and art that could cost anywhere from $250 to $1000. She added that the vignettes had to be updated frequently to keep pace with design trends.

Cherie Rose testified that although Renovizors struggled financially from the day it opened, she felt that the new location was the primary cause of Renovizors' lack of success. She explained that, despite the larger showroom and the Roses' marketing efforts, the new store failed to attract customers because it had limited parking and little foot traffic.

Cherie Rose developed a practice of asking customers to pay her by cash or by a check made payable to her. She kept a file in a separate drawer for cash payments. She explained that, as Renovizors' financial problems mounted, its vendors began requiring payment in cash (cash COD). When items were acquired on a cash COD basis, Renovizors did not issue checks and the transactions were not reflected in the cash disbursements journal.

In June of 1992, the SBE commenced an audit of Renovizors' sales tax returns for the period April 1, 1989 to March 31, 1992. The audit was later expanded to include sales tax returns from April 1, 1985. The auditor, Roberta Ross, was unavailable to testify at trial, however, Senior Tax Auditor Guido Da Costa Pereira testified for the SBE regarding audit procedures.

Ross' report indicates that her work was made difficult by the lack of supporting documentation or records. She discovered that there were no workpapers attached to Renovizors' sales tax returns and that it was impossible to reconcile the returns to the sales invoices provided. According to the audit report, "[c]ompleted sales invoices were filed in customer files, bookcases, vendor files, desks and, from a conversation with store personal [sic], the owners and/or employees' homes."

The audit report states that the Roses failed to produce any general ledgers, sales journals or other summary records that could be used to determine if reported sales were "clerically correct." Ross was given only Renovizors' cash disbursements journals. Renovizors failed to produce the dailies and did not disclose the separate file for cash COD's. Ross noted that "[t]he taxpayer indicated that during the audit period some records had been stolen along with a computer." She could not compare income tax returns to the sales tax returns because Renovizors had not filed state or federal income tax returns for any period after June 1989.

Due to the lack of available records, Ross concluded that she would have to use a "mark-up" approach to determine the validity of Renovizors' reported sales. Accordingly, she divided Renovizors' business into four categories: wallpaper, furniture, artwork and construction materials. She collected invoices in each category that could be used to determine the average markup, only using invoices that had purchase orders attached. Ultimately, Ross compiled 48 representative invoices. By comparing the amounts on the purchase orders with the amounts invoiced, she determined that the average weighted mark-up was 2.167. In other words, a product that cost $1.00 would be sold for $2.167.

Ross next calculated the proportion of Renovizors' business that involved construction work that was not subject to sales tax. Based on a review of the total business expenditures for the first quarter of 1992, she determined that 73.706% of the total expenditures were for inventory intended for resale.

Ross then calculated the total purchases of inventory intended for resale during the audit period. The expenditures reported for the third quarter of 1989 through the fourth quarter of 1992 were $2,647,064. Ross multiplied this by 73.706%, the factor representing inventory intended for resale, to arrive at $1,951,045 as the total purchases of inventory intended for resale for the period; she subtracted 1% for theft and breakage; she then multiplied the resulting amount, $1,931,535, by the inventory markup of 2.167, to arrive at $4,185,636 as the taxable sales for 1989 to 1992.

Based on these calculations, Ross determined that Renovizors had underreported taxable sales by a factor of 3.87. This meant that for every $3.87 of actual sales, Renovizors reported only $1.00. Based on these

findings, Ross recommended that the SBE impose an additional 25% fraud penalty on the total assessment due.

To support the fraud penalty, Ross referenced a fax from Cherie Rose to Lane Financial. Cherie Rose wrote on the fax that, although Renovizors' 1991 financial statement was still with its accountant, it initially showed gross sales for 1991 of just under $1 million with a net profit of approximately 11 to 12%. Renovizors reported only $172,121 in total sales for 1991 to the SBE. Ross also discovered a financial statement for the year ending June 30, 1990 attached to the fax. The financial statement indicates that Renovizors had gross taxable sales of $405,372.99 for 1990. However, Renovizors reported only $102,018 in taxable sales for 1990 to the SBE.

On June 1, 1993, the SBE mailed a notice of deficiency determination to Renovizors. Based on the audit, the SBE assessed an additional $230,846.11 in sales taxes owed, and a 25% fraud penalty of $57,711.71.

On June 14, 1993, William Rose and a Supervising Tax Auditor met to discuss the audit findings. Although the audit report repeatedly explains that the assessment may be adjusted if more complete documentation were provided, Rose testified that the need for additional documentation was never explained to him. He added that he was never told how the auditor had calculated the assessment. Rose was given time in which to provide additional materials to contest the audit. He did not present additional materials. Renovizors did not file a petition for reassessment, and, on July 16, 1993, the assessment became final.

The SBE later determined that the auditor had erroneously compared actual taxable sales for 1989 to 1992 to reported sales for the years 1985 to 1992. When the SBE recalculated the underreported taxable sales for 1989 to 1992, it discovered that Renovizors had underreported sales by a factor of 9.83, instead of 3.87.

The SBE also discovered the separate file Cherie Rose kept for invoices paid in cash or by a check made out to her after the audit from an anonymous person purporting to be an employee of Renovizors. The SBE contended that the fact that cash sales were not disclosed to the auditor would further increase the underreporting factor.

In April 1994, Renovizors' retail store was destroyed in a fire. Since the company carried only $30,000 in fire insurance, it suffered huge losses. It ceased operations and filed a Chapter 11 case on June 22, 1994, which subsequently converted to Chapter 7. On November 23, 1994, the SBE timely filed its proof of claim. On September 28, 1995, Renovizors filed this objection to the SBE's claim.

## II. CONTENTIONS OF THE PARTIES

The Roses contend that the SBE's assessment for underreported taxes is erroneous and dispute the auditor's findings on several grounds. First, they argue that the auditor ignored records that were made available to her. They claim that she never told them she needed records such as the dailies or other purchase orders, which were available in 1993, but were destroyed in the 1994 fire. Second, the Roses contend that 73.706%, which the auditor found to be the percentage of total expenditures spent on inventory intended for resale, is too high. Third, they dispute certain aspects of the 48 invoices the auditor relied on in determining an average weighted mark-up factor. And finally, the Roses argue that there is no evidence they spent the purported $4 million in unreported sales revenues.

William Rose testified that when the auditor came to Renovizors, he gave her a tour and took her to the bookkeeping office. He claimed he gave her Renovizors' bank statements and cash disbursements journals and told her that any other archived documents she might need were in the basement. He asserted that the auditor never asked for the purchase orders supporting the invoices. The SBE maintains that if the auditor had known the documents were available, she would have used them. It also notes that Renovizors was given an opportunity to file additional materials to contest the audit, but failed to do so.

The Roses maintain that 73.706% does not accurately reflect the percentage of expendi-

tures spent on inventory intended for resale. They testified that from 1985 to 1989, retail sales made up only about 20% of the business. . They claimed that it was not until after 1989, with the opening of the larger store, that retail sales and construction sales gradually became about equal. However, a review of Renovizors' sales tax returns from 1985 to 1992 indicates that retail sales were, with a few exceptions, at least 60% of the total revenues.

The Roses contend that the 48 invoices the auditor relied on in preparing the mark-up factor could not be representative because the store sold many one-of-a-kind items. They also claim the mark-up factor of 2.167 was too high. Cherie Rose testified that her average mark-up on items was only 70%. She noted that some of the invoices to which the purchase orders were compared contained additional costs for freight, installation and COD charges. In response, the SBE prepared new calculations based on Cherie Roses' testimony and came up with a markup factor of 1.51. Even using this mark-up factor for the audit period, Renovizors would have underreported its sales by a factor of 4.046%.

The Roses maintain that they live modestly and argue that there is no evidence indicating that they have spent large amounts of unaccounted-for funds. However, the SBE contends that Renovizors could not have run its business based on its reported sales revenues, and at the same time, paid for the inventory necessary to maintain the vignettes. The SBE suggests that Renovizors may have used the funds from unreported sales to finance the vignettes for the retail store. Cherie Rose countered that Renovizors was able to finance the vignettes by borrowing $70,000 from their home, $80,000 from her parents and $40,000 from William Rose's parents, in addition to an unspecified amount from savings.

The Roses maintain that, if there was underreporting of sales tax, it was inadvertent. They claim that Huotari prepared all of the sales tax returns for the business from the third quarter of 1985 through the fourth quarter of 1992. They add that they did not review the tax returns Huotari prepared—

Huotari merely told them the amount of tax due. Accordingly, the Roses argue that there is no evidence of fraudulent intent to support the imposition of a fraud penalty.

The parties agree that, absent fraud or an intent to evade the sales tax, the statutory time limit for mailing notice of the deficiency determination is three years. Cal. Rev. & Tax.Code § 6487(a) (West Supp.1997). The SBE filed its Notice of Deficiency on June 1, 1993. Thus, the SBE's claim for taxes due after June 1, 1990 is not barred by the statute of limitations. Moreover, if the SBE's finding of fraud is upheld, section 6487 would not bar the SBE's claim for additional sales taxes due for the period between April 1, 1985 and June 1, 1990.

### III. ANALYSIS

#### A. The SBE Bears The Burden of Proof.

■ Ordinarily, where the SBE makes a deficiency assessment, it is presumed to be correct as to the amount of tax and interest owed. *Paine v. State Bd. of Equalization*, 137 Cal.App.3d 438, 445, 187 Cal.Rptr. 47, 51 (1982). The taxpayers bear the burden of proving that the SBE's determination is incorrect. They must produce credible evidence from which a proper tax determination may be made. 137 Cal.App.3d at 442, 187 Cal.Rptr. at 49.

■ However, bankruptcy proceedings impose a different burden of proof. Although a properly filed claim constitutes *prima facie* evidence of the validity of the claim pursuant to 11 U.S.C. §§ 501 and 502(a), where the debtor presents evidence sufficient to rebut the claim, the ultimate burden of proving the validity of a claim remains with the creditor. *Franchise Tax Board v. MacFarlane (In re MacFarlane)*, 83 F.3d 1041, 1045 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997). Accordingly, the SBE bears the ultimate burden of proving both the validity of its assessment for underreported sales taxes and the appropriateness of the fraud penalty.

#### B. The SBE's Assessment For Underreported Sales Taxes Is Valid.

It appears from the testimony that the Roses had ample opportunity to contest the

audit findings in June of 1993, and failed to do so. Among the most damaging aspects of Renovizors' defense is the Roses' failure to produce even a single record to substantiate their testimony. Both Roses have referred to documents that would have been available at trial if the documents had not been kept on a computer that was stolen, or destroyed in the fire that occurred in 1994. The court is not persuaded by the Roses' claim that they did not understand the audit findings or the process for contesting the audit.

■ California Revenue and Taxation Code section 6481 provides that where the SBE is unsatisfied with the amount of tax provided for in a taxpayer's sales tax returns, it may "compute and determine the amount required to be paid upon the basis of the facts contained in the ... returns or upon the basis of any information within its possession or that may come into its possession." Where a taxpayer produces inadequate records in support of its tax returns, the taxing authority need only provide a rational reconstruction of the taxpayer's income to support its assessment. *Bradford v. Comm'r of Internal Revenue*, 796 F.2d 303, 305–06 (9th Cir.1986); *see also Adamson v. Commisioner of Internal Revenue*, 745 F.2d 541, 547 (9th Cir.1984).

> While the average citizen may find the record keeping required by the various taxing authorities to be onerous, excessive and vexatious, taxes appear to be a permanent and necessary part of our governmental structure. To fairly spread those taxes among the persons responsible for their payment mandates some basis for the assessment thereof. Records maintained by the taxpayer represent the most economical and least intrusive method for calculation. Fairness dictates that those persons responsible for paying the tax should maintain sufficiently complete records that the Board or other tax collecting agencies can determine if the correct amount of taxes have been paid. If the records are so deficient that a proper audit cannot be made, the defaulting record-keeping taxpayer must bear the consequences.

*Paine*, 137 Cal.App.3d at 444, 187 Cal.Rptr. 47. Moreover, a taxpayer that has failed to keep adequate records is not entitled to frustrate the taxing authority's reasonable attempts to compute the taxpayer's income "by compelling investigation and recomputation under every means of income determination." *Bradford*, 796 F.2d at 306, *quoting Webb v. Comm'r of Internal Revenue*, 394 F.2d 366, 373 (5th Cir.1968).

■ In the present case, the auditor was required to reconstruct Renovizors' income for the audit period due to a lack of documentation supporting Renovizors' sales tax returns. She determined that Renovizors owed $230,846.11 in underreported sales taxes. This amount appears to the court to be based on a fair reconstruction of Renovizors' income for the audit period, in light of the information available to the auditor. The Roses were given several opportunities to present documentation to rebut the audit findings prior to and during the hearings, and failed to do so. Accordingly, the portion of the SBE's claim for assessment for underreported sales taxes is allowed.

## C. The SBE Has Proven That Its Fraud Penalty Is Warranted.

California Revenue & Taxation Code section 6485 requires the SBE to assess a 25% penalty on a deficiency that is "due to fraud or an intent to evade" the payment of taxes. The parties dispute whether the SBE is required to prove this alleged fraud by clear and convincing evidence, or by a preponderance of the evidence.

■ This determination is important to the result of this case. The choice of the standard of proof to be applied is "more than an empty semantic exercise." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979), *quoting Tippett v. Maryland*, 436 F.2d 1153, 1166 (4th Cir. 1971). The standard of proof provides instructions to the trier of fact concerning the degree of confidence that the trier of fact should have in the factual conclusion reached in the case and the level of confidence society requires in the particular type of adjudication. *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1075–76, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). The relative impor-

tance that society attaches to the ultimate decision is reflected in the standard of proof. *Addington,* 441 U.S. at 423, 99 S.Ct. at 1807–08.

### 1. *The SBE Must Prove Fraud By A Preponderance of the Evidence.*

California's leading sales tax fraud case is *Marchica v. State Board of Equalization,* 107 Cal.App.2d 501, 237 P.2d 725 (1951). In *Marchica,* a taxpayer filed a case against the SBE seeking a refund of sales taxes and fraud penalties paid under protest. The SBE's motion for nonsuit was granted. The Appellate Court reversed, holding that the there was no presumption of tax fraud and that the SBE has the burden of proving fraud. 107 Cal.App.2d at 510, 237 P.2d at 731. In support of its holding, the Court quoted three federal tax fraud cases in which the circuit courts stated that the standard of proof for tax fraud is "clear proof" or "clear and convincing proof." 107 Cal.App.2d at 507–508, 237 P.2d at 729–730, *quoting Duffin v. Lucas,* 55 F.2d 786 (6th Cir.1932); *Budd v. Comm'r of Internal Revenue,* 43 F.2d 509 (3rd Cir.1930); *Jemison v. Comm'r of Internal Revenue,* 45 F.2d 4 (5th Cir.1930). The *Marchica* Court concluded that, "Fraud is odious. It is never presumed; but must be established by proof. The presumption always is in favor of good faith, innocence, honesty and fair dealing, except, perhaps, where confidential relations are involved. This presumption has been held to approximate in strength that of innocence of crime." 107 Cal.App.2d at 510, 237 P.2d at 731.

Twenty-six years after the *Marchica* decision, the California Supreme Court ruled that the standard of proof to be applied in civil fraud cases is proof by a preponderance of the evidence, unless otherwise established by law. *Liodas v. Sahadi,* 19 Cal.3d 278, 137 Cal.Rptr. 635, 562 P.2d 316 (1977). In *Liodas,* a bankruptcy trustee sued a debtor's former attorney for fraud and breach of fiduciary duty. The California Supreme Court granted a hearing "principally to determine the proper standard of proof of civil fraud." 19 Cal.3d at 282, 137 Cal.Rptr. at 636–37, 562 P.2d 316. At the time, the California appel-

late courts were divided regarding the correct standard. The *Liodas* Court traced precedents requiring a clear and convincing evidence standard to equity cases emphasizing "the presumption against fraud and in favor of honesty and fair dealing." 19 Cal.3d at 289, 137 Cal.Rptr. at 642, 562 P.2d 316. The presumption against fraud, the Court determined, was actually a preliminary allocation of the burden of proof, not an indication of the standard of proof required by law. 19 Cal.3d at 290, 137 Cal.Rptr. at 642, 562 P.2d 316.

The California Supreme Court explained that its earlier cases should have "laid to rest the early belief that civil fraud must be proved by more than a preponderance of the evidence." 19 Cal.3d at 289–90, 137 Cal. Rptr. at 641–42, 562 P.2d 316. The Court noted that California Evidence Code section 115 specifies that "except as otherwise provided by law," the standard of proof in civil cases is by a preponderance of the evidence. The Court adopted the recommendation of the editors of the California Jury Instructions that a jury determine all issues of fraud using the preponderance of the evidence standard. 19 Cal.3d at 290–91, 137 Cal.Rptr. at 643, 562 P.2d 316.

In order to prove fraud under California law, a plaintiff must show: (1) that the defendant made a false representation to the plaintiff; (2) that the defendant knew of or had reckless disregard for the statement's falsity; (3) that the misrepresentation was made in order to defraud the plaintiff; (4) that the plaintiff had a right to rely and did rely on the misrepresentation; (5) that the plaintiff suffered damage as a result of the reliance. *Alliance Mortg. Co. v. Rothwell,* 10 Cal.4th 1226, 1239, 44 Cal.Rptr.2d 352, 359, 900 P.2d 601 (1995). In order to prove tax fraud, the SBE must show that Renovizors knew of the falsity of its sales tax returns and that it filed those returns with the specific intent to evade paying a tax. *Marchica,* 107 Cal.App.2d at 509, 237 P.2d at 731. Reliance and injury need not be specifically proven, and may be assumed based on the nature of the tax system.[1]

---

1. The *Marchica* court did not require proof of reliance or injury in order to establish tax fraud.

■ There is little difference between the general civil fraud standard discussed in *Liodas* and the tax fraud standard in *Marchica*. The most significant difference between the two standards is that tax fraud requires a more specific intent than general civil fraud, and is not satisfied by gross negligence.[2] However, this difference does not exempt tax fraud from the larger category of civil fraud. Sales tax fraud, which subjects a taxpayer to a fine, is still civil in nature. There is an alternative criminal fraud provision contained in the tax code. *See* Cal. Rev. & Tax Code § 7152.

■ California courts have imposed a heightened standard of proof, in the absence of statutory language, where there are particularly important individual interests to protect. *Weiner v. Fleischman*, 54 Cal.3d 476, 487, 286 Cal.Rptr. 40, 46, 816 P.2d 892 (1991). Courts have found important individual interests in cases involving termination of parental rights, deportation and involuntary commitments. *Id.* at 487, 286 Cal.Rptr. 40, 816 P.2d 892, *quoting Herman & MacLean v. Huddleston*, 459 U.S. 375, 389, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983). Courts have not applied a heightened standard of proof in cases involving only severe civil sanctions. *See Weiner*, 54 Cal.3d at 487–88, 286 Cal. Rptr. 40, 816 P.2d 892 (discussing suits exposing a party to criminal prosecution or disbarment). In the present action, Renovizors' interest is monetary. There is no substantial personal interest, such as parental rights termination or deportation, involved in a sales tax fraud case. As a result, there is no reason to deviate from the normal standard of proof in civil actions.

The court finds that the SBE must prove its claim by a preponderance of the evidence. No other standard has been established by statute or by appellate case law since *Liodas*, and there are no important individual interests involved to compel an exception to the general civil standard.[3]

2. *The SBE Has Proven Fraud By A Preponderance of the Evidence.*

■ Because tax fraud is rarely established by direct evidence, fraudulent intent may be inferred from circumstantial evidence. *Alexander Shokai, Inc. v. Comm'r of Internal Revenue*, 34 F.3d 1480, 1487 (9th Cir.1994), *cert denied*, 514 U.S. 1062, 115 S.Ct. 1690, 131 L.Ed.2d 555 (1995). Badges of fraud include understatements of income,[4] failure to maintain adequate records, failure to file tax returns, implausible or inconsistent explanations for behavior, concealment of assets, and failure to cooperate with tax authorities. *Id.; Bradford*, 796 F.2d at 307; *see also* Appeal of Wickham, 1965 WL 1368 (Cal.St.Bd.Equal., Aug. 3, 1965).

■ The court is satisfied that several badges of fraud are present in this case. The two that weigh most heavily in favor of a finding of fraud are Renovizors' gross underreporting of sales taxes owed for a period of seven years, and Renovizors' failure to maintain adequate sales income records. Moreover, the Roses' implausible and inconsistent explanations for certain matters detract from Renovizors' overall defense, and are persuasive evidence of fraud. For example, the Roses' decision to expand Renovizors and to open a store requiring the expenditure of $300,000 to $600,000 for showroom vignettes seems inconsistent when, as they testified, the company was in dire financial straits from its inception. The Roses failed to satisfactorily explain how they financed these vignettes. They never explained why

It would be pointless to require the state to present evidence to show reliance and injury in every tax fraud case. The state relies on the truthfulness of the tax returns its taxpayers file in order to determine the amount of tax due. Underreported taxes result in injury because the state loses revenue.

**2.** *See Marchica*, 107 Cal.App.2d at 509, 237 P.2d at 731; Appeal of Wickman, 1981 WL 11741 (Cal.St.Bd.Equal., Feb. 2, 1981); *Kellett v. Commissioner*, 5 T.C. 608, 618, 1945 WL 52 (1945); *Pennybaker v. Commissioner*, 67 T.C.M. (CCH)

3157, 1994 WL 287646 (1994) (discussing penalties for fraud pursuant to I.R.C. § 6653(b)).

**3.** Although many SBE cases use the clear and convincing standard, there is no indication that the SBE has ever considered the *Liodas* holding.

**4.** However, the mere understatement of taxes owed in tax returns does not, by itself, prove fraudulent intent. *Marchica*, 107 Cal.App.2d at 510, 237 P.2d at 731.

they failed to disclose the existence of a separate file for cash sales to the auditor. Nor did the Roses explain why the income reported in Cherie Rose's 1991 fax to Lane Financial and in the 1990 audit statement differed significantly from the income reported in Renovizors' tax returns for 1991 and 1990. Inconsistencies such as these further validate a finding of fraud by a preponderance of the evidence.

### IV. CONCLUSION

For the foregoing reasons, the court allows the SBE's claim in the amount of $442,194.18 as filed.