Anivel J. GOMES, Petitioner-Appellant,

v.

Charles W. GAUGHAN, Superintendent, etc., Respondent-Appellee.

No. 72–1270.

United States Court of Appeals, First Circuit.

Heard Nov. 7, 1972.

Decided Jan. 4, 1973.

Michael S. Field, Boston, Mass., by appointment of the Court, with whom Field, Rudnitsky, Mullane & Schultz, Boston, Mass., was on brief, for appellant.

Charles E. Chase, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Criminal Division were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

CAMPBELL, Circuit Judge.

Anivel J. Gomes sought release from the Massachusetts Correctional Institution (M.C.I.) Bridgewater Treatment Center by petition for habeas corpus in the district court.[1] The district court dismissed on the ground, as we understand it, that petitioner had failed to state a claim. Gomes appeals raising questions under the double jeopardy clause of the Fifth Amendment, the Sixth Amendment right-to-counsel guarantee, and the Fourteenth Amendment due process and equal protection clauses. We affirm.

Substantially the same points raised here were determined against Gomes by the Massachusetts Supreme Judicial Court in Commonwealth v. Gomes, 355 Mass. 479, 245 N.E.2d 429 (1969). The parties have agreed that the issues raised here may be resolved on a record consisting of the facts set forth in that opinion and of the pleadings.

Gomes was committed to the Treatment Center pursuant to provisions of M.G.L. c. 123A, entitled "[The] Care, Treatment and Rehabilitation of Sexually Dangerous Persons."[2] Of concern in the present case are §§ 4, 5 and 6. Under § 4, a person convicted of enumerated sex-related crimes may be committed, upon motion of the court or the district attorney, to the Treatment Center or branch thereof for at most, sixty

---

1. Counsel advised us at oral argument that Gomes has since been released on parole under M.G.L. c. 123A, § 9. The case is not plainly moot since parole may be revoked, under the terms of that section, at any time.

2. The Massachusetts Supreme Judicial Court has consistently construed this statute as nonpenal. See Commonwealth v. Hogan, 341 Mass. 372, 170 N.E.2d 327, 330 (1960); Commonwealth v. Ackers, 343 Mass. 63, 175 N.E.2d 677, 680 (1961); LaMorre v. Superintendent of Bridgewater State Hospital, 347 Mass. 534, 199 N.E.2d 204, 206 (1964); Commonwealth v. Major, 354 Mass. 666, 241 N.E.2d 822, 823 (1968); Commonwealth v. Pimental, 1972 Mass.Ad.Sh. 1328, 285 N.E.2d 454, 455 (1972). In Commonwealth v. Page, 339 Mass. 313, 159 N.E.2d 82 (1959), the Supreme Judicial Court ordered a man released who, although committed under M.G.L. c. 123A, was confined with the convict population and was not receiving treatment.

Provisions of c. 123A have come under attack here. In Peterson v. Gaughan, 404 F.2d 1375 (1st Cir. 1968), we held that the statutory definition of sexually dangerous was not unconstitutionally vague, and that selecting out members of the state prison population for commitment proceedings did not unconstitutionally discriminate against them, as against state defendants given suspended sentences or probation, and federal prisoners.

days, for examination and diagnosis by at least two psychiatrists, who are to submit a written report to the court containing their diagnosis and recommendations for disposition. Should that report clearly indicate that the person is sexually dangerous, the court pursuant to § 5 must, on notice to the person, hold a hearing, at which the person is entitled to compulsory process and the appointment of counsel See Petition of Peterson, 354 Mass. 110, 236 N.E.2d 82, 84 (1968). The psychiatric reports, and evidence of the person's past criminal and psychiatric record, are admissible.[3]

If the court finds the person not sexually dangerous, it proceeds with disposition of the original case. If it finds the person sexually dangerous, the court may, in lieu of sentencing him for the original offense, commit him to the Treatment Center for an indeterminate period of one day to life, or may grant probation or suspend the commitment conditionally.

Section 6 prescribes other circumstances under which sexually dangerous commitment proceedings may be initated. If a prisoner under sentence in any institution appears to his warden, or to the district attorney for the district in which he was sentenced, to be sexually dangerous, the warden or district attorney may have the prisoner examined by a psychiatrist from the department of mental health. If that psychiatrist's report indicates that the person may be sexually dangerous, the warden or district attorney must transmit the report to the superior court for the district in which the prisoner was sentenced together with a motion that the prisoner be committed to the Treatment Center for, at most, 60 days, for diagnosis. If the prisoner is committed to the Treatment Center, and the psychiatric report

clearly indicates that he is sexually dangerous, a petition for commitment must be filed by the district attorney, after which a § ·5 hearing is held. Upon a finding of sexual dangerousness, the court may commit the person to the Treatment Center or return him to the institution where he is serving his sentence.[4]

In 1962, Gomes was convicted in the state court of assault with intent to rape. Before sentence, a § 5 hearing was held, at which the psychiatrists' report diagnosing him sexually dangerous was introduced. The parties stipulate that the evidence before the state court warranted a finding of sexual dangerousness (although no specific finding one way or the other was made). The court, however, declined to commit the petitioner to the Treatment Center. Instead, it sentenced him to imprisonment for three to ten years at M.C.I., Walpole, a sentence authorized for conviction of assault with intent to rape. The sentence expired on November 15, 1967.

On March 15, 1967, the superintendent of M.C.I. at Norfolk, to which petitioner had been transferred, initiated § 6 proceedings. Petitioner was committed for 60 days to the Treatment Center for diagnosis. The two psychiatrists who had examined him in 1962 once again examined him, and again diagnosed him sexually dangerous. A petition for commitment was filed on May 16, 1967, and counsel was appointed on May 22 to represent Gomes. Hearings were held in the state court on November 30, and December 15 and 20, 1967, the two diagnosing psychiatrists appearing and testifying that Gomes was sexually dangerous. The evidence the court had before it was characterized by stipulation as substantially the same evidence as was presented in 1962. There was no evi-

---

3. Under § 7, the psychiatrists' reports are available to the person's attorney.

4. Under · § 9, a person committed to the Treatment Center is entitled to a parole hearing during his first year of confinement, and at least once every three years

thereafter. Further, he is entitled once a year to a discharge hearing upon the filing of a written petition by him, a relative or friend. The hearing is conducted in accordance with the provisions governing a § 5 hearing.

dence of sexual misconduct by Gomes during his prison term.[5]  The state court found him sexually dangerous, and committed him to the Treatment Center.

## I

Citing North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the petitioner argues that the state put him in double jeopardy by subjecting him to multiple punishments for the same offense and by subjecting him to two judicial hearings on the question of his sexual dangerousness. The argument presupposes two premises that we do not accept.

One is that his prison sentence and his commitment to the Treatment Center were both "punishments" for his sexual dangerousness.  This is incorrect.  His 1962 prison sentence was for the crime of assault with intent to rape, of which he had been convicted; his 1967 commitment to the Treatment Center resulted from the finding, in a separate proceeding, of sexual dangerousness.

The second questionable premise is that the hearings in 1962 and 1967 adjudicated the identical issue, i. e. the petitioner's sexual dangerousness in 1962. The petitioner attempts to establish that premise by asserting that the "same set of facts" presented to the court in 1962 was the basis for the 1967 commitment. While a stipulation states that the 1967 evidence was "substantially the same" as in the 1962 proceeding, we take this to refer to petitioner's pre-1962 record and the absence of misconduct since 1962. But the petitioner underwent a sixty-day commitment for examination in 1967. He was then reexamined by the psychiatrists.  They filed a report with the court at the time of his hearing, appeared and testified at the hearing, and gave their opinion as to his current condition.  It appears, moreover, that petitioner had not been free from observation while in prison, having been given tranquilizing treatment which had created a state of remission.  There was thus a fresh and independent diagnosis of petitioner's propensities in 1967, notwithstanding inclusion of the same historical facts in the later report and notwithstanding that the diagnosis came to the same conclusion.

■ We, therefore, reject the petitioner's assertion of double jeopardy, whether conceived in terms of res judicata or collateral estoppel.  The issue before the court in 1967 (his then propensities) was not the same as that in 1962; nor was the "evidence" (given the fresh reexamination and psychiatric diagnosis) the same.

■ Even though not double jeopardy under the Fifth Amendment, the oppressive misuse of multiple commitment proceedings would doubtless be a violation of due process.  For example, had the petitioner been found *not* sexually dangerous in the 1962 proceeding, a question might arise whether another c. 123A hearing in the absence of intervening misbehavior was so unfair as to violate due process.  *See* Rochin v. California, 342 U.S. 165, 12 S.Ct. 205, 96 L.Ed. 183 (1952).  However, petitioner's assertion before the Supreme Judicial Court that the sentencing of him to prison in 1962 implies that he was found not sexually dangerous was rejected by that court, which said:

A criminal sentence given subsequent to a § 5 hearing is not an adjudication

---

5. The psychiatric report, which was before the court, indicated that the petitioner had been convicted of the Massachusetts sex offense which prompted the 1962 proceedings, a similar offense in Connecticut in 1954, and that he had been hospitalized in a mental hospital in connection with the 1954 offense.  It also said:
    "Sexual History.  Two serious crimes involving sex and both fused with aggression.  Otherwise, there is a normally heterosexual status . . . . [W]e have previously stated that he was mentally ill, and in the interim he has spent a good deal of time in mental hospitals.  Currently he is in a state of remission, but he remains so only because he is receiving tranquilizing medication . . . . Mental Deficiency. I.Q. 73 . . . . Treatment in this case will be difficult because of his mental status."

that a person is not sexually dangerous. Such a determination establishes only that a criminal sentence was the better alternative at that time. It does not establish the requirements of the public interest under c. 123A after the sentence is served. 355 Mass. at 586, 245 N.E.2d at 433 (citation omitted). Petitioner has produced nothing to persuade us to a contrary interpretation of the court's action in 1962.

## II

Much of petitioner's equal protection argument is premised on the faulty assumption, just discussed, that the 1967 adjudication was based upon the same set of facts as was elicited at the 1962 hearing. However, petitioner's 1967 commitment was not, as he urges, simply an arbitrarily delayed commitment based upon the same facts earlier adduced. It stemmed from an independent rediagnosis in 1967. Moreover, since the parties stipulate that the evidence in 1962 warranted a finding of sexual dangerousness, we are not impressed with the argument (if relevant) that petitioner might have then been found nondangerous and perhaps immunized against a later proceeding.

It is true that had there been a finding of dangerousness in 1962, followed by an immediate commitment, he would have received the benefits of care at the Treatment Center (such as these were in 1962; *see* Nason v. Superintendent of Bridgewater, 353 Mass. 604, 233 N.E.2d 908 (1968)).

■ However, we are not prepared to adopt an across-the-board rule that one convicted of a sex oriented crime who meets minimal standards of competency

must invariably be committed, if sexually dangerous, in lieu of serving a prison sentence lawfully imposed for the crime. As both the sentence and commitment were constitutionally warranted alternatives at the time, the court could in its discretion choose between them. *See* Williams v. New York, 337 U.S. 241, 247–248, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970).[6]

■ We do not know from this record what led the court to do what it did, but we can imagine circumstances under which deferring a c. 123A determination might seem in the interest of the person and the public: for example, if the court was unclear as to future dangerousness; if the defendant or his attorney requested imprisonment; if a psychiatrist, aware of a person's condition and the then available facilities and programs recommended prison (perhaps with medical supervision and administration of tranquilizers, or the like). In any event, nothing before us compels the assumption that the 1962 choice was irrational in petitioner's case.

## III

■ We come finally to petitioner's contention that he was entitled to a hearing and appointed counsel prior to and during the preliminary 1967 60-day commitment to the Treatment Center.

We reject at the outset the argument that petitioner was denied due process because he was not afforded a hearing with counsel prior to the 60-day commitment. This is not a case where a prisoner, sentenced for a non-sex related crime, was committed for a 60-day ob-

6. In the latter case, Mr. Chief Justice Burger said for the Court:

The mere fact that an indigent in a particular case may be imprisoned for a longer time than a non-indigent convicted of the same offense does not, of course, give rise to a violation of the Equal Protection Clause. Sentencing judges are vested with wide discretion in the exceedingly difficult task of deter-

mining the appropriate punishment in the countless variety of situations that appear. The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences . . . 399 U.S. at 243, 90 S.Ct. at 2023 (dictum)

servation on the basis of a warden's recommondation alone. Nor is this a case where proceedings for temporary commitment were initiated at the eleventh hour of a prisoner's incarceration, so that the 60-day commitment extended his confinement beyond his prison term. Here, petitioner was in prison for a sex crime, and had committed a sex crime in 1954, in connection with which he had been hospitalized. His 60-day commitment was entirely within the term of his prison sentence. We see nothing to suggest arbitrariness or unfairness in the decision to commit him for 60 days of observation. *Cf.* Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); Lessard v. Schmidt, 12 Crim.L.Rep'tr 2115 (E.D.Wis. Oct. 18, 1972) (three-judge court).[7]

Gomes' more serious contention is that under Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), he was entitled to appointed counsel during each critical stage of the 1967 c. 123A proceeding—and that his observational stay at the Treatment Center was such a critical stage.

If c. 123A proceedings are viewed purely as "criminal prosecutions" with-

in the meaning of the Sixth Amendment, the argument would have force. *Cf.* Specht v. Patterson, above, 386 U.S. at 609, 87 S.Ct. 1209, 18 L.Ed.2d 326. The Supreme Court has yet to determine if the Sixth Amendment and the full range of rights conferred under decisional law in criminal cases applies to proceedings of this nature. *See* Murel v. Baltimore City Criminal Court, 407 U.S. 355, 92 S. Ct. 2091, 32 L.Ed.2d 791 (1972).

The implications of an affirmative answer would be sweeping: if involuntary examination by state psychiatrists is likened to a police-station interrogation, a person would be entitled not only to the appointment but to the presence of counsel whenever he is so examined by a psychiatrist. Interrelated rights, such as the privilege against self-incrimination, would come into play. The effective use of involuntary psychiatric procedures might, indeed, be virtually eliminated. Whether such a result would be desirable is not easily assessed. Some psychiatrists and laymen would prefer the abolishment of all involuntary mental hospitalization. *See*, e. g., T. Szasz, M. D., Psychiatric Justice (1965), at 72–74.

■ We hold that a c. 123A procedure is a hybrid which, while partaking of many incidents of a criminal prosecution, is not, for constitutional purposes, exactly the same. Hence, the same rules do not invariably apply.[8] The control-

---

7. Consistent with *Specht*, Massachusetts does provide, as noted, and Gomes was granted, a hearing and counsel prior to determination of sexual dangerousness by the Court.

8. The Fourth Circuit has also rejected the argument that counsel should be present at all stages of the diagnostic proceeding. Tippett v. State of Maryland, 436 F.2d 1153 (4th Cir. 1971), cert. granted sub nom. Murel v. Baltimore City Criminal Court, 404 U.S. 999, 92 S.Ct. 567, 30 L.Ed.2d 552 (1971); cert. dismissed as improvidently granted, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972). The Circuit Court said, at 1158:

"The approach of Maryland's Defective Delinquent Act is essentially a medical approach, but the clear promise it

has demonstrated would be withdrawn should it be held . . . that the diagnostic and treatment processes must be converted into an adversary legal process in which the patient is entitled to all the constitutional protections available to a defendant in a criminal proceeding. It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that. The injection of broad legal restraints into the diagnostic and treatment procedures that would deny Patuxent's substantial prospect for improvement over our earlier practices might well restrain most other experimentation

ling standards are those of the due process clause of the Fourteenth Amendment. Plainly they include the right to a full judicial hearing, with counsel, before final commitment, and doubtless many other safeguards. Specht v. Patterson, above, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326.

■ However, within the limits of due process, we think that there is room for a state to establish reasonable involuntary psychiatric procedures to deal with highly disturbed persons having manifestly dangerous propensities. In reaching this result, we risk giving license to pseudo-psychiatric approaches which may yet be discredited. Still, we must recognize society's right both to treat and to protect itself against such disturbed individuals, employing methods which, if not perfect, seem more rational and humane than the mere use of longer prison sentences.

While both c. 123A and criminal proceedings may result in confinement, a person committed under c. 123A is entitled to treatment and he may not be confined with the criminal population. See Commonwealth v. Page, above, 339 Mass. 313, n. 2, 159 N.E.2d 82.[9] He is entitled to yearly review of his condition, and to release whenever his condition is ameliorated. c. 123A, § 9. While realistically we realize that all too often confinement of the emotionally disturbed has been little better than imprisonment, we cannot say that this must be so. Both the Massachusetts court and legislature have

made considerable effort to differentiate between the treatment of the sexually dangerous, on the one hand, and the penalizing of criminals on the other.

Under due process standards, and on this record, we conclude that the failure to appoint counsel or hold a hearing before or during the 60-day observation period did not violate petitioner's constitutional rights. Petitioner advances, it is true, plausible hypothetical reasons for the possible usefulness of appointed counsel. See also Tippett v. State of Maryland, above, 436 F.2d at 1163–1164 (Sobeloff, J.). However, he has alleged no facts from which prejudice to him can be inferred. Petitioner's argument that counsel could play a useful role in identifying false data in an inmate's file is plainly inapposite here: the petitioner's history was the same as that developed in the 1962 proceedings, when he had counsel. No new data, other than the psychiatrists' impressions based upon their reexamination, were involved.

Nothing in the record, moreover, suggests that the final commitment proceedings before the state court, at which Gomes was fully represented (his attorney having been appointed six months earlier), were inadequate to permit him fully to contest a finding of sexual dangerousness. He was entitled to process for the summonsing of witnesses; his attorney was entitled to review relevant psychiatric documents; and he would have been entitled to introduce independent psychiatric evidence.[10] The

looking toward conversion of our correctional institutions into effective rehabilitating agencies."

Judge Sobeloff, concurring in part and dissenting in part, seemed to agree that the Constitution did not require the presence of counsel during the individual examinations, though he did propose a "measure of participation by counsel." 436 F.2d at 1164.

Compare Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695, 701–703 (1969) involving the right to the presence of counsel at a competency examination in, however, a criminal prosecution.

9. As to a federal constitutional right to treatment, see Wyatt v. Stickney, 325 F.

Supp. 781 (N.D.Ala.1971); Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1966); Millard v. Cameron, 125 U.S.App.D.C. 383, 373 F.2d 468 (1966). See also Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

10. The Massachusetts Supreme Judicial Court has recently held that a person against whom a c. 123A petition for commitment is brought is entitled to full prehearing discovery, including interrogatories and depositions of witnesses (e. g. the examining psychiatrists) for the Commonwealth, and to a free transcript of such depositions. Commonwealth v. Pimental, above, n. 2, 1972 Mass.Ad.Sh. 1328, 285 N.E.2d at 455.

psychiatrists who had earlier examined him were present in court and testified, and thus were available for cross-examination. Further questions, if any, concerning the adequacy of the history upon which the diagnosis was made and the sufficiency of the examination could have been investigated then.

We hold that the absence of counsel and the lack of a hearing at the preliminary c. 123A proceedings did not deny petitioner due process of law.

Affirmed.