**Cornelius E. SARZEN, Plaintiff-Appellant,**

v.

**Charles W. GAUGHAN et al., Defendants, Appellees.**

**No. 73-1223.**

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1973.

Decided Dec. 10, 1973.

---

**32.** App. at 429, 430.

Francis John Stolarz, Boston, Mass., for plaintiff-appellant.

Charles E. Chase, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Crim. Div., were on brief, for defendants-appellees.

Before COFFIN, Chief Judge, Mc-ENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal from denial of a petition for habeas corpus once again raises questions about procedures under the Massachusetts law providing for commitment of sexually dangerous persons, M.G.L. c. 123A. Sarzen complains that he was denied counsel and the right to a hearing prior to the 60-day observational commitment which preceded his final commitment hearing. These deficiencies are alleged to have rendered his later indeterminate life commitment for sexual dangerousness invalid as lacking in due process of law.

The district court held that Sarzen's contentions were foreclosed by our decision in Gomes v. Gaughan, 471 F.2d 794, 798–801 (1st Cir. 1973).[1] But petitioner maintains, correctly we hold, that Gomes is not dispositive of the present facts.

Sarzen, on January 10, 1961, pleaded guilty in the Hampden County Superior Court to indictments for rape and for assault and battery. Seven weeks earlier, he had raped a 17 year old female not known to him; and a month before that he had approached and put his hands on another female who fled. His juvenile record showed two 1959 "peeping Tom" offenses, one of which had been continued without sentence, and one of which had led to his commitment in a Youth Service Board facility, followed by six months parole. Seventeen years old when indicted for rape and assault, Sarzen had reached only fourth grade in a regular school.

Upon acceptance of Sarzen's guilty pleas the court filed the assault charge and sentenced him to four to seven years imprisonment for rape.

The court did not at this time order Sarzen to be examined for possible commitment under M.G.L. c. 123A.[2] He was instead confined to the Massachusetts Correctional Institution at Concord to serve the sentence for rape. Six months

---

**1.** An evidentiary hearing was earlier held before the federal magistrate, who concluded that Sarzen's claims, though meritorious, should first be presented to the Massachusetts Supreme Judicial Court. The district court disagreed. Citing Commonwealth v. Gomes, 355 Mass. 479, 245 N.E.2d 429 (1969), infra, it found that recourse to the state court would be futile.

**2.** It might have done so since, under § 4, if one is found guilty of described sex crimes, including rape, the court, prior to sentencing, may, on its own motion, commit the defendant for 60-days observation to the "Cen-

ter," i. e. the Treatment Center established by the Department of Mental Health within the Massachusetts Correctional Institution at Bridgewater. See §§ 1, 2. Of course, the defendant at this stage would already be represented by counsel. At the Center the defendant would be examined for sexual dangerousness by at least two psychiatrists who report their findings to the court. If the defendant is reported to be sexually dangerous, the court then conducts a hearing on this issue, following which, in lieu of imposing sentence, it may order him committed to the Treatment Center for an indeterminate period ranging from one day to life.

later, in July of 1961, Sarzen was examined by Dr. Cohen, a psychiatrist, after the Concord Superintendent had requested the Department of Mental Health to arrange for an examination. The request and examination are prescribed first steps to a determination of sexual dangerousness under § 6 of M.G.L. c. 123A. Unlike § 4, § 6 applies to persons convicted of any category of crime (non-sexual as well as sexual), and its procedures are available to the Commonwealth at any time until a sentenced prisoner is released. A single psychiatrist must first determine that the inmate "may" be sexually dangerous. Correctional authorities next file a motion with the court, which is accompanied by a copy of the psychiatrist's letter, requesting an order for 60-days commitment for "examination and diagnosis." § 6. If that motion is allowed, the inmate is transported to the Center where he is examined by at least two psychiatrists, § 6. If their report, which must be filed with the court within the 60-day period, "clearly indicates" sexual dangerousness, the district attorney "shall" file a petition for commitment, giving notice to the inmate or others on his behalf. Thereafter, an adversary court hearing is held at which the inmate is entitled to counsel and other safeguards. *See* §§ 5, 6. *See* Gomes v. Gaughan, *supra.*

Sarzen testified that Dr. Cohen's July, 1961, visit was unannounced, brief, and unexplained. A guard told him that "everybody who commits a sex crime" was so examined. But Dr. Cohen, he claimed, revealed nothing about the purpose of the interview. Dr. Cohen, on the other hand, testified that while he could not remember the interview, he "always" tells inmates his name, who he is, who sent him, "and why I am examining, to determine whether or not they are sexually dangerous, and whether in my opinion they should have a period of observation at the Bridgewater Treatment Center."[3]

Whether or not Dr. Cohen advised Sarzen of the purpose of the interview, it is undisputed that Sarzen did not see nor learn of the letter thereafter sent by Dr. Cohen to the Superintendent of Concord recommending a 60-day commitment for further observation and study. The letter also set forth purported facts about Sarzen,[4] of which several are mistaken or are disputed by him. Dr. Cohen erroneously wrote that "[t]he records also reveal two arrests for drunkenness in 1959," and that "[i]n addition, he was suspected of several attacks on girls in *1961*." [Emphasis supplied.] The county in which the superior court sat was misstated. Sarzen also now disputes Dr. Cohen's characterization of the rape as "bizarre", and denies ever admitting to Dr. Cohen that he had committed several assaults.

Possibly the errors came in part from a hasty reading of a document entitled "Official Version of Present Offense" prepared by someone at Concord soon after Sarzen came to be confined there. It details, seemingly from police sources, the rape and assault, and also recounts that the police suspected Sarzen "as being the person who was committing assaults upon women which had plagued them for the previous few weeks." The chronology, while vague, is apparently

---

3. The Magistrate appears to have believed Sarzen. He found that, "At the time of the interview, Sarzen was unaware of its purpose."

4. "This man, age 18, was sentenced in the Worcester Superior Court on 1/10/60 to a term of 4–7 years for rape. This crime was of a rather bizarre nature and was accompanied by force, violence and threats of bodily harm. This crime which occurred 10/17/60 had been preceded by a crime similar in nature and with the same pattern. However, in this case subject panicked and ran when the victim screamed. The records also reveal two arrests for drunkenness in 1959. There were two instances of peeping tom activities 3/30/59 and 12/31/58. In addition, he was *suspected of several attacks on girls in 1961.*

When interviewed, the subject admitted the crimes of assaults and his peeping Tom activities with all the details described in the police reports."

1960 or earlier; possibly Dr. Cohen took "1961" from the date of the document itself. It is unclear from where the misinformation as to drunkenness convictions came. Prison records indicated that Sarzen was evicted from the family home by his father "while the father was experiencing one of his drunken rages." Possibly the father's own record was confused with petitioner's.

Dr. Cohen's letter, together with a letter from the Superintendent of Concord containing an accurate, if less colorful, summary of Sarzen's background and record, was sent in August, 1961, to the Superior Court. A motion for a 60-day commitment for examination and diagnosis accompanied these papers. The supporting papers did not indicate sexual misbehavior by Sarzen since his incarceration. Sarzen was not notified of the motion for commitment nor advised of the substance of any of the documents filed with the court. The motion was allowed without hearing on September 12, 1961. Sarzen was not offered, nor provided with, counsel.

He was taken to the Treatment Center for observation, and remained there during September and October, 1961. He testified that he neither asked nor was advised by the staff why he was there,[5] or what the consequences of his examination might be, but conceded that he did learn about such matters from inmates. Sarzen also admitted to receiving, while at Bridgewater, a letter from the public defender who had represented him in the criminal proceeding, which informed him that "because of the sex crime . . . [he] could be committed to Bridgewater."

Before Sarzen was returned to Concord, Dr. Cohen and Dr. Kozol, another Bridgewater psychiatrist, had filed with the court a report expressing the opinion that Sarzen was sexually dangerous.[6] Sarzen was not shown nor even notified of the report and, although he asked, was not told that he had been found to be sexually dangerous. He asserts that it was some ten months later that he first learned, from a Concord social worker, that he had been pronounced sexually dangerous.

Seven months after the psychiatrists' report was filed, the District Attorney petitioned the court, on May 13, 1962,[7] to have Sarzen committed as a sexually dangerous person as defined by Chapter

---

5. The Administrative Assistant to the Head of the Treatment Center testified that at the time Sarzen was committed for observation, it was the practice "to inform him orally of the procedures he would be going through." Nothing written would, however, have been presented. Today a three page information sheet is given to each inmate, describing the sexually dangerous statute, and advising the inmate of the possible consequences of the examination. The sheet indicates that the inmate may, if he wishes, appear at one staff meeting where his case is discussed, and may see any member of the observation staff upon request. A decision, once reached by the psychiatrists, will be reported to him. The inmate is told that "A letter has gone out to your next of kin informing them of your observation commitment here and giving them the name and telephone number" of the responsible staff member.

6. The report repeated the misinformation of "1959 drunkenness (2)." It referred to the 9/28/60 assault and battery as a "similar offense" to the rape. The basis of the diagnosis was that his "offenses have shown a progression in severity and seriousness . . . . Admits rape and violence in the process. A repeater. A danger in terms of his uncontrollable aggressive impulses."

7. Section 6 provides that when the district attorney files a petition for final commitment,

"[H]e shall give notice to the prisoner or to his parents, spouse, issue, next of kin, guardian, or next friend, if it appears to the district attorney that such prisoner is incapable of conducting his contest to the report. The court may require such further notice as it deems necessary to protect the interest of the prisoner, may continue the hearing pending such notice and may appoint a guardian ad litem, if necessary."

We assume that this statutory notice requirement was complied with, although there is no evidence on the point in the record. The petition itself consists of two sentences, reciting that two named psychiatrists have certified subject to be sexually dangerous and requesting his commitment.

123A. Nothing further happened until November of 1963, when, at the District Attorney's request, Sarzen was reexamined (at Concord) by Dr. Cohen. Dr. Cohen then wrote another letter repeating that Sarzen was sexually dangerous, citing much the same history as that in his letter of August, 1961.

Sarzen had been eligible for parole in April, 1962, and April, 1963, but was turned down on both occasions because of the outstanding petition to have him adjudged sexually dangerous. During this time Sarzen unavailingly wrote to state officials in an effort to get his case resolved.

The final commitment hearing took place in the Superior Court on February 24, 1964, more than two years after the psychiatrists' report had been filed with the court. An attorney for Sarzen was, for the first time, appointed on the day of the hearing. Two psychiatrists testified, a Dr. Weiss, who had examined Sarzen once at Concord two days before the hearing, and Dr. Cohen. Dr. Weiss gave an opinion of sexual dangerousness based on his examination of Sarzen's pre-1961 record and history, which included Dr. Cohen's letters, as well as his impressions from the single interview.

Dr. Cohen's opinion of sexual dangerousness was based on Sarzen's pre-1961 history and a total of six interviews, four of them during the 60-day Bridgewater commitment in 1961. During a reasonably rigorous cross-examination, it was brought out that he likely erred in believing that Sarzen had two drunkenness convictions in his record. However, Dr. Cohen testified that the error would not affect his conclusion of sexual dangerousness. The two year delay, its affects on petitioner's parole possibilities, and his attempts to expedite .the hearing were also mentioned. No witnesses were presented for Sarzen. He took no appeal from the Superior Court's finding of sexual dangerousness.

In 1972, during the pendency of the federal habeas corpus proceedings, Sarzen petitioned the Superior Court for re-examination and release pursuant to M.G.L. c. 123A, § 9.[8] Following a hearing held in July, 1972, he was found to be no longer a sexually dangerous person and released upon the following conditions: probation for five years during which time he must attend meetings of Alcoholics Anonymous, receive out-patient care at the Treatment Center, and report to his probation officer monthly.

I

■ The Commonwealth urges that Sarzen has not given its courts an opportunity to pass on his claim and, therefore, has failed to exhaust his state remedies.[9] It reasons that Commonwealth v. Gomes, 355 Mass. 479, 245 N. E.2d 429 (1969) dealt merely with the facial validity of parts of M.G.L. c. 123A, and that the mere anticipation of an unfavorable disposition is not enough to show exhaustion. In *Gomes* the Supreme Judicial Court, stressing the civil nature of c. 123A proceedings, rejected a due process attack levelled on "the ab-

8. " . . . [A]ny person committed to the center, or a branch thereof, shall be entitled to have a hearing for examination and discharge once in every twelve months, upon the filing of a written petition by the committed person . . . or any friend . . . . The hearing shall be conducted in the same manner as is provided for in sections five and six . . . . " The statute goes on to provide for annual examinations by the Department of Mental Health of each committed person. If release is ordered, it may be "conditional," with the individual ordered to report for periodic treatment and subject to supervision by a probation officer. Conditions and terms may be "revised, altered, amended, revoked by the court at any time," and while conditionally released, the former inmate remains subject to the jurisdiction of the court until discharged. § 9.

9. That Sarzen did not appeal from the Superior Court judgment ordering his commitment does not, of course, necessarily preclude habeas corpus relief based on a denial of due process if he exhausted, or should be excused from exhausting state remedies open at the time his petition was filed in federal court. Fay v. Noia, 372 U.S. 391, 398–399, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

sence of notice and of counsel in connection with the temporary commitment of the defendant to the treatment center." 355 Mass. at 483, 245 N.E.2d at 432. The court held:

"The provision for a sixty-day examination of a prisoner under c. 123A, § 6, and a formal report, is a reasonable extension of society's right to such custodial examination . . . . The statute and our rule [that there may be no punitive aspects to c. 123A confinement] reasonably protect the examined person inasmuch as no indefinite commitment can be made without notice and hearing and the opportunity for the aid of counsel. The preliminary examination, like all the other relevant recorded data, is available to aid the court at that hearing to determine if the defendant is a sexually dangerous person." 355 Mass. at 485, 245 N.E.2d at 433.

There was no intimation that the court, presented with a different set of facts, would be prepared to recognize constitutional infirmities in actions conforming to the statutory procedure. *See also* LaMorre v. Superintendent, 347 Mass. 534, 538–39, 199 N.E.2d 204, 206–207 (1964).

■ When the highest state court has addressed itself to the issues raised, and there are no intervening Supreme Court decisions on point, nor any indication that the state court intends to depart from its former decisions, the exhaustion doctrine does not require a petitioner to present his claims in state court. *See, e. g.,* Walsh v. Picard, 446 F.2d 1209, n. 2 (1st Cir. 1971); Perry v. Blackledge, 453 F.2d 856 (4th Cir. 1971); Lucas v. Michigan, 420 F.2d 259 (6th Cir. 1970); Pratt v. Maine, 408 F. 2d 311 (1st Cir. 1969). The Commonwealth contends that this well-accepted doctrine should not be applied to Sarzen because recourse to the state courts would not have been a futile or empty gesture even in 1971 when the petition was filed. It points to the change in the personnel of the Supreme Judicial Court since *Gomes* was decided in 1969, and to the likelihood that recent "striking developments" in the procedural due process area might further cause the state court to rethink the position taken in *Gomes*.

■■ We do not treat these contentions as wholly idle. The magistrate, indeed, although agreeing with petitioner on the merits, concluded that it would be wise to allow the state court to review the matter. He was persuaded by the change in the court's composition and the likelihood that the Superior Court judge who committed Sarzen did not (and probably could not have been expected to) know what had transpired previously. While there is sense in both propositions, neither is compelling. When a state, or for that matter, federal court has spoken, stability and *stare decisis* require that litigants and other courts take its pronouncement at face value until formally altered. Even in as rapidly changing a field as constitutional law, two years is too brief a period to presume change. A federal court cannot require a petitioner to go to another court merely because it speculates that new judicial personnel may be persuaded to reach different results.

■ A federal court should recognize, whenever possible, the often greater ability of strong state courts to deal effectively with state legislative schemes. But we agree with the district court that petitioner, whose grievances go back to proceedings occurring a decade ago, and who has been litigating before us since 1971, is entitled not to be sent to yet another tribunal, no matter how able and enlightened.

II

Sarzen contends that the Commonwealth denied him due process by committing him for 60-days observation without first affording him a hearing, with counsel, to determine his probable sexual dangerousness. Stated thus narrowly, Sarzen's claim might seem to be foreclosed by our decision in Gomes v.

Gaughan, *supra,* 471 F.2d at 798, in which we held that a sex conviction gave the Commonwealth sufficient cause to commit an inmate for 60-days psychiatric observation within the term of his sentence.

However, it was made clear in *Gomes,* citing Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), that c. 123A proceedings must afford due process. *Id.* 471 F.2d at 800. As one aspect of due process, we mentioned that counsel appointed prior to the 60-day diagnostic commitment might be useful "in identifying false data in an inmate's file." *Id.* 800. Only the peculiarities of Gomes' case led us to conclude that such a role (or some substitute procedure for verifying the data) was "inapposite". As it happened, Gomes and previous counsel had had a chance to review the relevant data, and Gomes' present counsel, having been appointed well before the final commitment hearing, would have enabled Gomes to use available pre-trial discovery procedures if needed. For these two reasons, we concluded that Gomes received ample opportunity to review and question "the adequacy of the history upon which the diagnosis was made." *Id.* 801.

Sarzen's case is altogether different. Sarzen did not have the assistance of counsel until the very day of his final hearing and, therefore, the pre-trial discovery procedures which we catalogued in *Gomes, Id.* 800, might as well not have existed. Moreover, there were factual errors in the history relied upon by the psychiatrists in making their initial and later diagnosis. Sarzen, never advised of the data being used, had no opportunity, formal or informal, to question it before the day of final commit-

ment; he was not even notified of many of the statutorily-prescribed steps being taken to have him committed. Sarzen was walled off from effective participation in his own case until the last day, when, in all probability, anything he might have done was too late.

Nothing in *Gomes* sanctioned c. 123A procedures falling so short of the fairness and respect for elementary rights which is at the heart of due process. *See* Mr. Justice Frankfurter concurring in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 161, 170, 71 S.Ct. 624, 95 L.Ed. 817 (1951).[10]

 We merely recognized in *Gomes,* as did the Supreme Court recently in Gagnon v. Scarpelli, 411 U.S. 778, 788, 93 S.Ct. 1756, 1763, 36 L.Ed.2d 656 (1973), that due process is "not so rigid as to require that the significant interests in informality, flexibility, and economy must always be sacrificed." Indeed, we reject Sarzen's contention that due process necessarily required a counselled hearing prior to the 60-day commitment. Since the rape conviction provided sufficient basis for the Commonwealth's decision to examine him,[11] procedures other than a counselled preliminary hearing might have served adequately to permit examination and correction of the historical data upon which so much of the 60-day psychiatric evaluation was to hinge.

 Due process in this setting calls for a fair balancing of the state's interest in utilizing responsible diagnostic procedures to deal with "highly disturbed persons having manifestly dangerous propensities," *Gomes, supra,* 471 F.2d at 800, against the inmate's right to avoid a grievous loss of liberty and lifetime stigma except under the most rigorous safeguards. Without pretend-

10. In the cited case, Justice Frankfurter went on to say, aptly, 341 U.S. at 170, 71 S.Ct. at 648, "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights."

11. While a probation violator is constitutionally entitled to a preliminary hearing at the time of his arrest as well as a later, more

comprehensive hearing, Gagnon v. Scarpelli, *supra,* 411 U.S. at 782, 93 S.Ct. 1756, the same principle is not applicable here. No further loss of liberty results from the observational commitment of one already in prison, nor, where a sex-crime was committed, is there any possible dispute as to a reasonable basis for brief psychiatric observation.

ing to deal with every possible situation, we think due process requires at least the following:

1. An inmate is entitled to be notified promptly whenever each of the critical steps imposed by M.G.L. c. 123A, § 6, as a prerequisite to an adjudication of sexual dangerousness, is taken. He may not be kept in the dark concerning actions so vital to his future. The prison superintendent's request that an inmate be examined to determine if he "may" be sexually dangerous is the first such critical step. Therefore, before the involuntary psychiatric interview, the inmate must be informed at least of its purpose and possible legal consequences. Dr. Cohen insisted that it was his usual practice to do so; and we would assume, as a matter of ethics, that a psychiatrist would feel bound to advise an inmate whether he was appearing in the role of personal counsellor or potential prosecutor.[12] The inmate is also entitled to know if, after examination, the single psychiatrist has recommended that he may be sexually dangerous. He is entitled to be notified when the superintendent or other authority moves for a 60-day commitment and of the disposition of the motion. He is entitled to be informed (as apparently Bridgewater now recognizes) of the outcome of his examination there.

Timely notice of allegations and charges is an elemental aspect of due process. See, e. g., Mullane v. Central Hanover Bank, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); In re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). Concealed proceedings, in or out of court, cannot satisfy the requirements of due process. When a prisoner knows what is happening he can take steps, even before the appointment of counsel becomes constitutionally mandated, to protest obvious errors and to secure the assistance of private counsel, family or friends.

2. Prior to the 60-day observational commitment, opportunity must be afforded to the inmate to review and object to the record, history and other assembled facts of his life which psychiatrists may use in evaluating whether he is sexually dangerous. Cf. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed. 2d 656 (1973); United States v. Picard, 464 F.2d 215 (1st Cir. 1972). It is obvious from the statutory definition of sexual dangerousness[13] and from the privileged status (see § 5) of psychiatric reports in these proceedings, that an inmate's history—the background facts found in his prior criminal record and in writeups of social workers and probation officers—are factors crucial to the psychiatric "diagnosis." See Tippett v. Maryland, 436 F.2d 1153, 1164 (4th Cir. 1971) (Sobeloff, J. concurring in part, dissenting in part), cert. granted sub nom., Murel v. Baltimore City Criminal Court, 404 U.S. 999, 92 S.Ct. 567, 30 L. Ed.2d 552 (1971), cert. dismissed as improvidently granted, 407 U.S. 355, 92 S. Ct. 2091, 32 L.Ed.2d 791 (1972). If the present case is typical, a determination of sexual dangerousness may be principally a projection of future conduct from past behavior. Postponing the opportunity to point out purported errors until the day of the final commitment

---

12. The Hippocratic oath contains the words, "I will prescribe regiment for the good of my patients . . . . and never do harm to anyone." One interviewed involuntarily is entitled to be told whether he is being examined for purposes possibly inimical to his own interests. It is not a sufficient answer to say that a sexually dangerous commitment is always for the inmate's own good. In this nation we do not believe that Big Brother always knows best. An inmate facing loss of liberty may question the benevolence of his prosecutors.

13. "The words 'sexually dangerous person' as used in this chapter shall have the following meaning:—Any person whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive behavior and either violence, or aggression by an adult against a victim under the age of sixteen years, and who as a result is likely to attack or otherwise inflict injury on the objects of his uncontrolled or uncontrollable desires."

hearing is a mockery of justice. The state psychiatrists will long ago have rendered a written diagnosis based upon the questioned facts; their opinion will have crystallized. Gagnon v. Scarpelli, *supra*, 411 U.S. at 785, 93 S.Ct. 1756. Of course, the inmate's claims of error need not be accepted if themselves incorrect. But he is entitled to make them known at a time when they can still be effective.

What procedures are best for this fact-verification process we do not attempt to suggest. "The primary responsibility for articulating standards of due process lies with those who have the most intimate knowledge of both the interests of prisoners and the administrative burdens entailed with providing due process . . . ." Palmigiano v. Baxter, 487 F.2d 1280, 1286–1287 (1st Cir. 1973). We do not preclude the possibility that social workers or others in the state's employ might objectively and fairly review records with the inmate and note in writing his objections and corrections. While counsel might be helpful, especially in the case of disturbed or badly educated inmates, we cannot say that counsel is constitutionally mandated for this purpose [14] prior to the observational commitment of one serving sentence for a sex crime, provided there is a careful and conscientious effort to check out the historical data with the inmate and to see that it is accurate and complete. Alternatively, a preliminary administrative or judicial hearing might be held. We hold simply that the inmate must be afforded a reasonable opportunity to see, examine, and correct, where justified, the historical data which is to be used in reaching the critical opinions on his sexual dangerousness made during the 60-day commitment. In so stating, we do not attempt to consider the Commonwealth's responsibilities to those who may not be legally competent, nor do we consider the case of an inmate whose sentence is not for a sex crime.

3. The assistance of counsel should be offered to indigent inmates soon after the filing with the court, during the 60-day commitment, of a report of sexual dangerousness by the examining psychiatrists.[15] In Gagnon v. Scarpelli, *supra*, 411 U.S. at 785, 93 S.Ct. 1756, the Supreme Court described how a parole or probation officer's role as benevolent counsellor is "compromised" when the officer has decided to recommend revocation of parole or probation. Thereafter, the officer's view of the probationer's or parolee's conduct differs "in this fundamental way" from the latter's own view. *Id*, 785, 93 S.Ct. 1756 requiring that the difference be resolved. At that point, both the state and probationer/parolee have interests in accurate fact finding and the informed use of discretion. Closely analogous is the psychiatrists' role-change when, incident to the 60-day commitment, they declare an inmate to be sexually dangerous. Until then, the psychiatrists may be expected to be relatively open and professionally detached. Indeed, we understand that three-quarters of the persons sent for 60-day observation to Bridgewater are found by the staff not to be sexually dangerous. Before the psychia-

14. No constitutional right to hearing and counsel before temporary commitment for examination, pursuant to 18 U.S.C. § 4244, has been recognized. *See* United States v. Muncaster, 345 F.Supp. 970 (N.D.Ala.1972); Caster v. United States, 319 F.2d 850 (5th Cir. 1963), cert. denied, 376 U.S. 953, 84 S. Ct. 972, 11 L.Ed.2d 973 (1964).

15. By analogy, counsel is required "at every stage of a criminal proceeding where substantial rights of a criminal may be affected." Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 257, 19 L.Ed.2d 336 (1967) (sentencing); *see also* Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (custodial interrogation); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (post-indictment lineup); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (preliminary hearing). Although the full panoply of criminal due process is not necessarily applicable to c. 123A proceedings, *see* Gomes v. Gaughan, *supra*, 471 F.2d at 799, we follow the Supreme Court's directive in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), not to allow the "civil" label to deflect us from the fundamental interest at stake. *See* Heryford v. Parker, 396 F.2d 393, 396–397 (10th Cir. 1968).

trists have rendered an adverse report, we are not persuaded that their role is so greatly at variance with the interests of the inmate as to require the state to assume the burden of appointing counsel for each person being examined or about to be examined.

But once an adverse report is issued, the psychiatrists' role has changed. They have, in effect, become prosecutors; their "benevolence" has been "compromised," *Id.* 785, 93 S.Ct. 1756, the inmate needs independent assistance, including that of counsel. By then the state is no longer merely engaged in investigation and diagnosis, *see* Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The filing of a petition for final commitment by the district attorney has become a purely ministerial act. § 6. The inmate faces the certainty of proceedings which can lead to commitment for life. *Cf.* Lessard v. Schmidt, 349 Supp. 1078, 1099 (E.D. Wis.1972) (three-judge court).

Only if counsel is made available well before the day of the final commitment hearing will an inmate be assured of the effective assistance, and not mere presence, of counsel. Representation at the final hearing may otherwise be a "formality . . . a grudging gesture to a ritualistic requirement." Kent v. United States, 383 U.S. 541, 561, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84 (1966). Counsel may help, in c. 123A, as in juvenile proceedings, "to make skilled inquiry into the fact, . . . and to ascertain whether he has a defense and to prepare and submit it." In re Gault, 387 U.S. 1, 36, 87 S.Ct. 1428, 1448, 18 L.Ed. 2d 527 (1966). An attorney needs time, in advance of "trial," to collect and examine records and reports, to talk to his client and to psychiatrists to decide whether a further psychiatric examination or consultation should be sought, and to formulate cross-examination of the state's experts. Moreover, competent representation before trial in Sarzen's case would doubtless have gained Sarzen a prompt hearing instead of the altogether unnecessary delay from October 1961, to February 1964. Had the court been made aware of the delay, there can be little doubt that it would have acted promptly.

A danger with procedures of this unique nature is that people assume, because the prisoner is a "patient" and his guardians are "doctors," that whatever is done will be done in the inmate's best interest. But, of course, much, perhaps most, of M.G.L. c. 123A is for society's own protection. *Cf.* In re Ballay, 482 F.2d 648, 657–658 (D.C.Cir.1973). Rehabilitation and physical removal are goals common to civil and criminal commitment. When, to the person acted upon by the state, the consequences of commitment rather than incarceration appear to be identical, limits must be applied to what is done in the role of *parens patriae.* In re Gault, *supra;* In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Not all psychiatrists, no more than all juvenile authorities, can be presumed to be competent or well disposed. Moreover, the inherently speculative nature of psychiatric predictions, resulting in confinement not for what one has done but for what one will do, demands more than minimal procedures, particularly when such confinement is accomplished outside the traditional criminal process, with its right to jury trial and other ancient safeguards. *See* Murel v. Baltimore City Criminal Court, 407 U.S. 355, 364–365, n. 2, 92 S.Ct. 2091, 32 L.Ed.2d 791 (Douglas, J., dissenting); Note, Civil Commitment of the Mentally Ill: Theories and Procedures, 79 Harv.L.Rev. 1288 (1966).

Any one faced with indefinite incarceration, whatever his past history, is entitled to formal notice of the steps being taken against him, to know about and challenge the historical data which will accompany him to the Treatment Center for the 60-day observational commitment, and to have the assistance of counsel well before the last day of the proceedings. We hold, therefore, Sarzen was denied the fundamentals of due process guaranteed by the Fourteenth Amendment.

## III

We remand the question of relief to the district court. To our knowledge the question of relief was not argued in the district court, and it was not argued before us; and, of course, the parties had no way of anticipating the grounds of our decision. The district court should decide whether the deficiencies in procedural due process do or do not constitute harmless error. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). But the court may also need to consider to what extent, if any, other statutory provisions and the later § 9 proceedings ameliorate the effect of constitutional infirmities on the original § 6 commitment. As petitioner was released in 1972, the Commonwealth and the petitioner may also wish an opportunity to consider a possible consent disposition serving maximally both petitioner's needs and those of the public.

Remanded for proceedings consistent herewith.

Lumbard, Circuit Judge, concurred and filed opinion in which Timbers, Circuit Judge, joined.